# *EXHIBIT A*

EFiled: Oct 23 2012 09:52PM EDT
Transaction ID 47292553
Case No. 7841-CS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CARLYLE INVESTMENT MANAGEMENT, L.L.C., TC GROUP, L.L.C., TCG HOLDINGS, L.L.C., DAVID M. RUBENSTEIN, DANIEL A. D'ANIELLO, WILLIAM E. CONWAY, JR., JAMES H. HANCE, JOHN C. STOMBER, and MICHAEL J. ZUPON, | ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | C.A. No. 7841-CS |
| MOONMOUTH COMPANY S.A., PLAZA MANAGEMENT OVERSEAS S.A., PARBOLD OVERSEAS LTD., LOUIS J.K.J. REIJTENBAGH, and STICHTING RECOVERY CCC, | ) ) ) ) ) |  |
| Defendants. | ) ) |  |

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiffs Carlyle Investment Management L.L.C. ("CIM"), TC Group, L.L.C. ("TC Group"), TCG Holdings, L.L.C. ("TCGH") (collectively, the "Carlyle Entities"), David M. Rubenstein, Daniel A. D'Aniello, William E. Conway, Jr., James H. Hance, John C. Stomber, and Michael J. Zupon (collectively with the Carlyle Entities, "Plaintiffs"), by their attorneys, for their First Amended Verified Complaint, upon knowledge as to themselves and their own conduct, and otherwise upon information and belief, allege as follows:

### INTRODUCTION

1.     In 2009, Defendants Moonmouth Company S.A. ("Moonmouth"), Plaza Management Overseas, S.A. ("Plaza"), Parbold Overseas, Ltd. ("Parbold"), and Louis J.K.J. Reijtenbagh ("Reijtenbagh") (collectively, the "Reijtenbagh Defendants") released any and all

claims they had or may have had against Plaintiffs, including any and all claims arising out of or related to Moonmouth's 2006 investment in Carlyle Capital Corporation, Ltd. ("CCC").

2.     Undeterred by their contractual obligations, the Reijtenbagh Defendants sought to pursue such claims against Plaintiffs in the Netherlands relating to their investment in CCC.  By doing so, the Reijtenbagh Defendants breached the Releases (as defined below) to which they agreed in 2009, and also threatened to breach a valid and enforceable forum selection clause to which they separately agreed that requires them to bring all claims with respect to their CCC investment only in Delaware.

3.     Similarly, Defendant Stichting Recovery CCC ("SRCCC"), a Dutch entity represented by Reijtenbagh's attorneys which purports to represent the interests of CCC shareholders, including the Reijtenbagh Defendants, who agreed to identical forum selection clauses, sought to bring similar claims in the Netherlands in violation of the same exclusive Delaware forum selection clause.

4.     These breaches and threatened breaches caused Plaintiffs to suffer damages.  Accordingly, on September 6, 2012, Plaintiffs filed a verified complaint (the "Verified Complaint") in this Court seeking to hold Defendants to account for their breaches and requesting that the Court enjoin them from further violations of their contractual promises.

5.     After receiving notice of Plaintiffs' Verified Complaint, Defendants retreated from their prior statements and actions, disclaiming an intent to pursue claims against Plaintiffs in the Netherlands now or in the future.  They refused, however, to memorialize the withdrawal of their claims in a formal stipulation and proposed order.  In addition, Defendants' immediate rescission of their claims in response to the Verified Complaint gave Plaintiffs additional reason to believe that the Reijtenbagh Defendants are pursuing similar relief through

other mechanisms in other fora, in violation of both the Releases and the exclusive Delaware forum selection clause to which they agreed.

## PARTIES

6.     Plaintiff Carlyle Investment Management L.L.C. ("CIM") is a Delaware limited liability company with its principal places of business in the District of Columbia and New York.  Between August 29, 2006 and March 17, 2008, CIM served as the investment manager of CCC.  CIM is an affiliate of Plaintiffs TC Group and TCGH.

7.     Plaintiff TC Group, L.L.C. ("TC Group") is a Delaware limited liability company with its principal place of business in the District of Columbia.  TC Group is an affiliate of Plaintiffs CIM and TCGH.  "The Carlyle Group" is a trade name for TC Group.

8.     Plaintiff TCG Holdings, L.L.C. ("TCGH") is a Delaware limited liability company with its principal place of business in the District of Columbia.  TCGH is an affiliate of Plaintiffs CIM and TC Group.

9.     Plaintiff David M. Rubenstein ("Rubenstein") is a co-founder and managing director of The Carlyle Group.

10.    Plaintiff Daniel A. D'Aniello ("D'Aniello") is a co-founder and managing director of The Carlyle Group.

11.    Plaintiff William E. Conway, Jr. ("Conway") is a co-founder and managing director of The Carlyle Group.  Conway served as a director of CCC.

12.    Plaintiff James H. Hance ("Hance") is an operating executive of The Carlyle Group and its affiliated entities.  Hance served as the non-executive chairman of CCC's board of directors.

13.     Plaintiff John C. Stomber ("Stomber") was a managing director of Plaintiff CIM, and served as chief executive officer, president, and chief investment officer of CCC. He also served as a non-voting director of CCC.

14.     Plaintiff Michael J. Zupon ("Zupon") was a founding member, chief investment officer, and managing director of The Carlyle Group's U.S. leveraged finance business unit.   He served as a non-voting director of CCC and as the non-executive vice chairman of CCC's board.

15.     Defendant Moonmouth is a company organized under the laws of the British Virgin Islands with its registered office in Tortola, British Virgin Islands.   Upon information and belief, Moonmouth is an investment entity owned and controlled by Defendant Louis Reijtenbagh and is an affiliate of Defendants Plaza and Parbold.

16.     Defendant Plaza is a privately held investment company organized under the laws of the British Virgin Islands with its registered office and a place of business in Tortola, British Virgin Islands.   Upon information and belief, Plaza is wholly owned and controlled by Defendant Louis Reijtenbagh.   Plaza is an affiliate of Defendants Moonmouth and Parbold.

17.     Defendant Parbold is a company organized under the laws of the British Virgin Islands with its registered office and a place of business in Tortola, British Virgin Islands.   Upon information and belief, Parbold is an investment entity controlled by Defendant Louis Reijtenbagh and an affiliate of Defendants Plaza and Moonmouth.

18.     Defendant Louis J.K.J. Reijtenbagh is a Dutch citizen.   Upon information and belief, he resides in Monte Carlo, Principality of Monaco and/or Hong Kong, People's Republic of China.   He is the owner, President, and chief executive officer of Plaza and the

beneficial owner of Moonmouth and Parbold. Upon information and belief, Reijtenbagh controls

Plaza, Moonmouth, Parbold and numerous other related investment entities.

19.     Defendant Stichting Recovery CCC ("SRCCC") is an entity incorporated

under Dutch law with its registered office in The Netherlands. Upon information and belief,

SRCCC was created by or at the instigation of Reijtenbagh or his affiliates. SRCCC's articles of

association state that SRCCC's purpose is to represent the interests of shareholders of CCC.

## FACTUAL ALLEGATIONS

### I.     Carlyle Capital Corporation

20.     Plaintiffs TC Group, TCGH, and CIM are part of a group of entities that

collectively comprise The Carlyle Group, a global private equity firm that manages a number of

investment funds across a variety of investment disciplines. CIM is an affiliate of TC Group and

is the vehicle through which certain such funds are managed. TCGH is a holding company, with

no operational activities or responsibilities, and is an affiliate of CIM and TC Group.

21.     On August 29, 2006, CCC was organized as a limited company under the

laws of the Island of Guernsey, Channel Islands. CCC was an investment fund that primarily

held AAA-rated residential mortgage backed securities ("RMBS"), which were backed by home

mortgages located in the United States and guaranteed by Fannie Mae and Freddie Mac. CCC

commenced operations in September 2006. CIM served as the investment manager for CCC

from its incorporation until CCC was placed into liquidation on March 17, 2008.

### A.     The CCC Subscription Agreement's Delaware Forum Selection Clause

22.     Beginning in September 2006 and continuing through February 2007,

investors were able to purchase CCC Class B shares through several rounds of private

placements. All investors who purchased shares in CCC through these private offerings (the

"Private Placement Investors") were required to execute substantively identical subscription

agreements to effectuate their purchases (the "Private Placement Subscription Agreements"). All properly executed Private Placement Subscription Agreements were and remain valid and binding contracts. CCC's private placements raised a total of $600 million in capital for the company.

23.     In July 2007, CCC held a global offering, in which shares were offered to institutions and persons meeting certain criteria, and its Class B shares were listed on the EuroNext exchange in Amsterdam. The offering raised a total of $345 million in new capital for CCC.

24.     Defendant Reijtenbagh is a wealthy Dutch individual with homes and investment offices in New York City, the British Virgin Islands, Australia, Hong Kong, and across Europe. Reijtenbagh has, over time, made substantial investments in numerous funds affiliated with The Carlyle Group, including Carlyle Partners V, L.P. ("CPV") and Carlyle Europe Partners III, L.P. ("CEP III").

25.     On or about December 20, 2006, Reijtenbagh, acting through Defendant Plaza, caused Defendant Moonmouth to execute a Private Placement Subscription Agreement (the "Moonmouth Subscription Agreement") in connection with Moonmouth's investment of $60 million in CCC. In exchange for its investment, Moonmouth received three million (3,000,000) Class B shares in CCC. Upon information and belief, in 2007, Reijtenbagh caused Moonmouth to transfer one million (1,000,000) of the CCC Class B shares that Moonmouth purchased to Defendant Parbold.

26.     On or about December 28, 2006, Plaintiff Stomber countersigned the Moonmouth Subscription Agreement for CIM as the investment manager for CCC. The Moonmouth Subscription Agreement was and remains a valid and binding contract.

27.     The Moonmouth Subscription Agreement contains an exclusive Delaware

forum selection clause that provides in pertinent part as follows:

> The courts of the State of Delaware shall have exclusive
> jurisdiction over any action, suit or proceeding with respect to this
> Subscription Agreement and the Investor hereby irrevocably
> waives, to the fullest extent permitted by law, any objection that it
> may have, whether now or in the future, to the laying of venue in,
> or to the jurisdiction of, any and each of such courts for the
> purposes of any such suit, action, proceeding or judgment and
> further waives any claim that any such suit, action, proceeding or
> judgment has been brought in an inconvenient forum, and the
> Investor hereby submits to such jurisdiction.

An identical exclusive Delaware forum selection clause appears in each and every Private

Placement Subscription Agreement.

28.     As this Court has held, this very exclusive Delaware forum selection

clause, which is contained in every Private Placement Subscription Agreement, including the

Moonmouth Subscription Agreement, is a valid and enforceable provision.  *See Carlyle*

*Investment Management, L.L.C. v. National Industries Group (Holding)*, C.A. No. 5597-CS,

2012 WL 4847089, at *7-11 (Del. Ch. Ct. Oct. 11, 2012).  Moreover, as this Court has explained,

and as two federal courts have confirmed, the "with respect to" language used in these forum

selection clauses is "broad" and encompasses not only claims for breach of the Private Placement

Subscription Agreements, but also all common law and statutory claims relating in any way to

Private Placement Investors' investments in CCC.  *See id.* at *12 n. 103; *see also Huffington v.*

*T.C. Grp., LLC*, 685 F. Supp. 2d 239 (D. Mass 2010), *aff'd*, 637 F.3d 18 (1st Cir. 2010).  The

forum selection clause thus requires each Private Placement Investor and its affiliates, including

Defendants, to bring any and all claims they may have with respect to their investment in CCC

only in the courts of the State of Delaware.

7

29.     By agreeing to the "exclusive jurisdiction" of the "courts of the State of Delaware," and by the terms of the contract, all Private Placement Investors and their affiliates, including Defendants, "irrevocably waive[d], to the fullest extent permitted by law, any objection that [they] may have . . . to the laying of venue in, or to the jurisdiction of, any and each of such courts." This waiver encompasses any right to remove this case to federal court.

30.     The Private Placement Subscription Agreements also included a clause providing that the agreement "shall be binding upon the Investor and the heirs, personal representatives, successors, and assigns of the Investor" as well as a Delaware choice of law clause requiring that the agreement "shall be governed, construed and enforced solely under the laws of the State of Delaware[.]"

**B.      CCC Is Placed Into Liquidation**

31.     CCC's investment portfolio was comprised principally of AAA-rated RMBS, which carried the express guarantee of Fannie Mae and Freddie Mac and the implied guarantee of the U.S. government. The securities in which it invested involved no sub-prime mortgages. In March 2008, however, the U.S. financial markets experienced a sudden and extreme liquidity crisis, resulting in unprecedented instability in both the valuation of CCC's assets and its financing for those assets. As a result, CCC's cash reserves (known as its "liquidity cushion") were depleted. On or around March 6, 2008, CCC defaulted on certain of its financing agreements with some of its counterparties.

32.     On March 17, 2008, CCC was placed into liquidation by the Royal Court of Guernsey and several liquidators (the "Joint Liquidators") were appointed to oversee CCC's affairs and winding-up. On September 29, 2009, the Joint Liquidators announced that investors in CCC, including Moonmouth and the other Private Placement Investors, were unlikely to receive any distribution from CCC in the liquidation.

33.    On July 7, 2010, CCC's Joint Liquidators filed four substantively identical lawsuits against Plaintiffs in New York, Washington, D.C., Delaware and Guernsey (collectively, the "Liquidator Action").  The Liquidator Action alleged various breaches of duties and sought in excess of $1 billion in damages.

## II.    The Reijtenbagh Defendants Release All Claims Against Plaintiffs

### A.    Reijtenbagh and Plaza Identified Potential Claims against the Carlyle Entities

34.    Sometime after CCC was placed into liquidation and after Carlyle initiated discussions with investors about ways they could recoup some of their losses, Defendants Plaza and Reijtenbagh retained Lipman Karas, an Australian law firm, to analyze potential claims that might be made against the Carlyle Entities arising out of Moonmouth's investment in CCC.

35.    Upon information and belief, Reijtenbagh, his family, and his affiliates have worked with Lipman Karas partner Jason Karas in a number of other legal matters unrelated to CCC.  For example, Reijtenbagh reportedly provided substantial litigation funding for an Australian lawsuit brought by Lipman Karas on behalf of the liquidator of One.Tel, a failed Australian telecommunications company.  *See* Katherine Jimenez, *Dutch Millionaire Behind One.Tel Legal Action*, THE AUSTRALIAN, August 27, 2010.

36.    Karas and his law firm prepared a memorandum for Plaza asserting that the Carlyle Entities had mismanaged CCC and outlining possible legal claims that Plaza might be able to bring against the Carlyle Entities (the "Lipman Karas Memo").  In the course of discussing potential CCC-related claims that Plaza might have, Reijtenbagh provided a copy of the Lipman Karas Memo to representatives of Carlyle.

37.    After initial discussions about resolving these and other Carlyle-related issues were not productive, Defendants Reijtenbagh, Moonmouth, and Plaza indicated that they

were considering bringing suit against the Carlyle Entities and their affiliates in connection with the failure of CCC. However, Reijtenbagh subsequently indicated he did not intend to pursue his claims at that time, and no complaint was ever filed.

**B.      Reijtenbagh and His Affiliates Encountered Legal and Financial Problems**

38.      At one point, Reijtenbagh, his family, and their affiliated investment entities were reported to control in excess of $1 billion in investments, including hundreds of millions of dollars of investments held in various funds run by and/or affiliated with the Carlyle Entities. In 2009, however, Reijtenbagh and his affiliates, including Plaza, encountered serious legal and financial difficulties.

39.      In February 2009, it was reported in the media that Belgian tax authorities had obtained a judgment in the amount of approximately €180 million against Reijtenbagh for evading Belgian taxes by fraudulently claiming residence in Monaco and that police had raided his home to seize assets and search for evidence. It also was reported that Reijtenbagh subsequently fled the country and went into hiding. Belgian authorities later seized approximately €120 million of his assets in partial satisfaction of the outstanding tax obligations. A Belgian court subsequently approved this asset seizure.

40.      The Belgian tax judgment was not Reijtenbagh's only legal and financial problem. In spring 2009, it was reported that various private equity funds in which Reijtenbagh and his affiliates were invested began marking down their holdings in the midst of the broader global financial crisis. Because Reijtenbagh and his affiliates had borrowed substantial amounts from various financial institutions to finance their investments, these markdowns put Reijtenbagh and his affiliates at risk of substantial collateral calls from lenders such as Credit Suisse, which had provided them with over $700 million in financing. *See* Nathan Vardi, *Dr. Debt*, FORBES, May 25, 2009.

10

41.     On or about March 13, 2009, Plaza and several affiliated entities, including Bundora Associates, Inc. ("Bundora"), commenced insolvency proceedings in the British Virgin Islands.  Certain of Reijtenbagh's investments in funds managed by the Carlyle Entities were owned through Bundora, which is an affiliate of Plaza and Moonmouth and which is owned and controlled by Reijtenbagh.  A court in the British Virgin Islands appointed Plaza as the foreign representative of these Reijtenbagh-affiliated entities, and Plaza commenced Chapter 15 bankruptcy proceedings in the United States Bankruptcy Court for the District of New Jersey on March 18, 2009.

42.     On or about March 24, 2009, several entities affiliated with Credit Suisse filed suit in New York state court (the "CS Action") against, *inter alia*, Plaza, Louis Reijtenbagh and his two sons, Jacco and Edgar Reijtenbagh.  The lawsuit alleged that the Reijtenbaghs and their affiliates had engaged in a "brazen conspiracy . . . to cheat and deceive on an unmatched scale."  Compl. ¶ 6, *CS Structured Strategies B, L.P., et al. v. Louis J.K.J. Reijtenbagh, et al.*, No. 09600910 (N.Y. Sup. Ct. March 24, 2009).   According to the CS Action complaint, Reijtenbagh and his affiliates had pledged their interests in various private equity funds as collateral for over $700 million in financing provided by the CS Action plaintiffs.  The complaint further alleged that Reijtenbagh and his affiliates then fraudulently transferred $340 million-worth of this collateral to other entities controlled by Reijtenbagh in a series of sham transfers.  Based on this scheme, the CS Action asserted claims for fraudulent misrepresentation, aiding and abetting fraud, fraudulent transfer based on actual and constructive fraud, and tortious interference with contract.  The CS Action plaintiffs sought damages in excess of $340 million. A New York state court subsequently entered a temporary restraining order freezing

11

Reijtenbagh's assets.   That order was later modified to allow the CS Action defendants to transfer certain assets to settle the CS Action.

43.   Similarly, on or about April 1, 2009, JPMorgan Chase Bank, N.A. ("JPMorgan") filed a separate lawsuit in New York state court against Louis, Jacco, and Edgar Reijtenbagh and Monte-Carlo Art S.A., another entity owned and controlled by the Reijtenbagh family.   JPMorgan had provided Reijtenbagh and his affiliates with a $50 million revolving credit facility, which was secured by numerous works of fine art owned by Reijtenbagh (directly or through his affiliates) and located in Jacco and Edgar Reijtenbagh's New York apartment. Referencing the CS Action, JPMorgan's lawsuit alleged that "Louis Reijtenbagh and his companies have experienced a material adverse change in [their] business and [their] financial condition," causing Reijtenbagh to default on approximately $23 million owed to JPMorgan under the credit facility.   Compl. ¶¶ 36-37, *JPMorgan Chase Bank, N.A. v. Louis J.K.J. Reijtenbagh, et al.*, No. 601001 (N.Y. Sup. Ct. April 1, 2009).   JPMorgan's lawsuit further alleged that the Reijtenbaghs had refused to surrender over $40 million-worth of fine art that served as collateral for the loans and had wrongfully moved some of the collateral to a location outside the United States, in violation of various agreements.

44.   Dutch bank ABN Amro also had provided Reijtenbagh and his affiliates with approximately €52 million in financing.   Like the JPMorgan credit facility, the ABN Amro financing was secured by numerous pieces of fine art, including some of the same artwork that was pledged as collateral to JPMorgan.   In or about April 2009, ABN Amro filed suit against Reijtenbagh and his affiliates in the Netherlands to secure the collateral.   A Dutch court later

ordered Reijtenbagh to pay ABN Amro more than €25 million.  In fall 2009, ABN Amro seized more than 60 pieces of Reijtenbagh's artwork.[1]

### C.   The Reijtenbagh Defendants Release All Claims Against Plaintiffs

45.     Upon information and belief, the events described in paragraphs 39 to 44 and other circumstances left Reijtenbagh and his affiliates with an urgent need for cash, causing them to seek to liquidate in whole or in part their interests in various investment funds, including several funds controlled by and/or affiliated with the Carlyle Entities, by selling them to third parties.

46.     In or around August and September 2009, Reijtenbagh and his affiliates sought the Carlyle Entities' assistance in transferring limited partnership interests held by Bundora in CPV and CEP III, two funds affiliated with the Carlyle Entities, to several different third-party purchasers.  Because Bundora's limited partnership interests in CPV and CEP III were subject to certain transfer restrictions, Reijtenbagh and his affiliates needed the consent and assistance of the funds and Carlyle to effectuate the transfers.

47.     To accomplish the transfers of Reijtenbagh's interests in CPV and CEP III, three sets of transfer agreements (the "Transfer Agreements") were executed by (1) Bundora and its affiliates, including Plaza and Reijtenbagh; (2) the third-party purchasers; and (3) affiliates of the Carlyle Entities.  Reijtenbagh caused Bundora to execute seven separate Transfer

---

[1]   These are only some of Reijtenbagh's publicly reported fraudulent schemes.  He also was convicted in the 1980s of defrauding KLM airlines by purchasing infant tickets for round-the-world travel and then fraudulently converting them to adult tickets for use by him and his adult family members.  *See* Lucette ter Borg, *A Dangerous Man: The Rise And Fall Of Louis Reijtenbagh*, NRC HANDELSBLAD, May 5, 2009.  This scheme earned Reijtenbagh, who is a physician, the nickname "Baby Doc."  Additionally, Reijtenbagh was sued by shareholders of European oil company Petroplus after he allegedly embezzled €42 million in funds earmarked for distribution as dividend payments.  Reijtenbagh reportedly agreed to pay €25 million to settle the Petroplus matter.  *Id.*; Vanda Carson, *Man Who Funded Case Against Bond's Banks In Art Scandal*, SYDNEY MORNING HERALD, May 19, 2009.

Agreements in connection with the transfers of his interests in CPV and CEP III that are implicated here.

48.     Bundora, Reijtenbagh, and their affiliates were represented by U.S. counsel in connection with the negotiation and execution of each Transfer Agreement. Each Transfer Agreement constitutes a valid and binding contract.

49.     In addition to setting forth the various terms and conditions of the transfers, each Transfer Agreement also included a release-of-claims provision (collectively, the "Releases"). One of the Releases, for example, provided as follows:

> In consideration of the promises and other consideration set out herein: (a) [Bundora] and [the third-party purchaser] on the one hand; and (b) [the fund and various Carlyle-affiliated entities] on the other hand (including in each case, each of their respective predecessors in interest, successors in interest, present and former Affiliates and any agents, representatives, officers, directors, employees, executives, parents, shareholders, partners, members, principals, subsidiaries and controlled companies, heirs, executors, administrators, successors, assigns, sister or related companies and partnerships of the foregoing (collectively, the "Related Parties")) hereby **fully release and discharge the other and, in each case, the other's Related Parties, from any and all obligations, claims, demands, damages, liabilities**, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents and executions whatsoever, **of whatever kind or nature, actions, causes of action or suits at law or in equity of whatever kind, state or federal, known or unknown, suspected or unsuspected,** whether brought in any federal or state court, or in any court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, which any of the releasing parties ever had or now has, or may have in the future, **upon or by reason of any matter, cause or thing occurring on or prior to the date hereof,** except as otherwise expressly provided in this Agreement.

(Emphasis added). Each Release is substantively identical and each is a valid and binding provision of the Transfer Agreement in which it appears.

14

50.     For purposes of the Releases, each of the Plaintiffs is a "Related Part[y]" of CPV and/or CEP III and the Carlyle-affiliated entities named in the relevant Transfer Agreements, and the Reijtenbagh Defendants are each "Related Parties" of Bundora. Accordingly, by agreeing to and executing the Transfer Agreements and Releases for valuable consideration, the Reijtenbagh Defendants released any and all claims they had or may have had against Plaintiffs based on any and all events occurring on or prior to August 18, 2009, the date the first Transfer Agreements were signed by Bundora.

51.     This intentionally broad release encompasses any and all claims the Reijtenbagh Defendants had or may have had against Plaintiffs at that time, including any and all claims the Reijtenbagh Defendants had against Plaintiffs arising out of or related in any way to Moonmouth's investment in CCC.  Any one of these intentionally broad Releases by itself was sufficient to release any and all CCC-related claims the Reijtenbagh Defendants had or may have had against Plaintiffs.  Taken together, these seven releases demonstrate a clear intent on the part of the Reijtenbagh Defendants and Plaintiffs to release and waive any and all such claims.

## III.   Defendants Breached The Releases And Threatened To Breach The Subscription Agreements' Exclusive Delaware Forum Selection Clause

52.     Notwithstanding the Releases, Reijtenbagh and/or his affiliates retained a Dutch law firm, Lemstra van der Korst, and took affirmative steps to pursue claims against Plaintiffs in the Netherlands in connection with Moonmouth's investment in CCC, in breach of both the Releases and the Moonmouth Subscription Agreement's exclusive Delaware forum selection clause.

53.     In June and/or July 2012, Plaintiffs and CCC's former independent directors, Robert B. Allardice III, Harvey J. Sarles, and John L. Loveridge (collectively, the "Independent Directors"), each received copies of two letters sent by Lemstra van der Korst.

One letter was sent on behalf of the Reijtenbagh Defendants (the "Moonmouth Letter"), and the other was sent on behalf of Defendant SRCCC (the "SRCCC Letter").

###### A.     The Moonmouth Letter

54.     Each Plaintiff received at least one copy of the Moonmouth Letter, and each Plaintiff's Moonmouth Letter was substantively identical.

55.     The Moonmouth Letter recounted the circumstances of Moonmouth's $60 million investment in CCC and alleged that Plaintiffs are responsible for CCC's failure in spring 2008.

56.     The Moonmouth Letter stated that based on these allegations, "Moonmouth holds [Plaintiffs] liable" under several Dutch statutes "for all the damage that it sustained and any and all damage that it sustains in the future in connection with" its investment in CCC.  The letter further contended that a "serious, personal accusation and claim . . . can be made against" Plaintiffs under Dutch law.  Accordingly, the Moonmouth Letter purported to "interrupt[] the statute of limitations . . . within the meaning of Article 3:317 of the Dutch Civil Code" for any claims that the Reijtenbagh Defendants, "any and all persons and/or legal entities affiliated with [Louis] Reijtenbagh," or any other CCC investor may have based on the allegations made in either the Moonmouth Letter or the Liquidator Action.

57.     The retention of Lemstra van der Korst and the Moonmouth Letter each represented an affirmative step taken by the Reijtenbagh Defendants in advancement of claims under Dutch law against Plaintiffs in the Netherlands.  The Moonmouth Letter constituted a particularly significant step, as the Dutch statute of limitations is five years and arguably would have expired on or before July 11, 2012 but for the Moonmouth Letter.[2]  Moreover, the retention

---

[2]  Plaintiffs do not concede that the Letters were adequate to toll the statute of limitations.  In

of Lemstra van der Korst and the Moonmouth Letter demonstrated that the Reijtenbagh Defendants intended to pursue claims in the Netherlands.

58.     However, as alleged above in paragraphs 45 through 51, in 2009, the Reijtenbagh Defendants and their affiliates released any and all claims they had or may have had against Plaintiffs, including any and all claims related to or arising out of Moonmouth's investment in CCC, through the Releases.   Even if the Reijtenbagh Defendants and their affiliates had not released all claims against Plaintiffs in 2009 (which they have), the Moonmouth Subscription Agreement nonetheless requires them to bring any and all claims against Plaintiffs related to or arising out of Moonmouth's investment in CCC only in the courts of the State of Delaware, not the Netherlands.

**B.     The SRCCC Letter**

59.     Each Plaintiff received at least one copy of the SRCCC Letter and each Plaintiff's SRCCC Letter was substantively identical.

60.     The SRCCC Letter advised that "SRCCC's purpose – in accordance with its Articles of Association – is representing the interests of all parties (both natural persons and legal entities) that hold and/or held shares in [CCC] and sustained and/or might sustain damage(s) in the future in connection with the acts" of Plaintiffs.

61.     The SRCCC Letter also alleged that Plaintiffs are responsible for CCC's failure in spring 2008.  In support of this claim, the SRCCC Letter repeated substantially the same factual allegations made in the Moonmouth Letter.

62.     The SRCCC Letter stated that based on these allegations, "SRCCC holds [Plaintiffs] liable" under several Dutch statutes "for all the damage that the investors sustained

---

any event, as described below, Defendants withdrew the Moonmouth and SRCCC Letters upon receiving notice of Plaintiffs' Verified Complaint.

and any and all damage that they will sustain in the future in connection with" their investment in CCC.  The letter further contended that a "serious, personal accusation and claim . . . can be made against" Plaintiffs under Dutch law.  Accordingly, the SRCCC Letter purported to "interrupt[] the statute of limitations . . . within the meaning of Article 3:317 of the Dutch Civil Code" for claims that SRCCC and investors in CCC may have based on the allegations made in either the SRCCC Letter or the Liquidator Action.

63.    Because SRCCC claimed to represent "the interests of all parties (both natural persons and legal entities) that hold and/or held shares in [CCC,]" SRCCC purported to represent the interests of all Private Placement Investors.  In connection with their purchase of shares in CCC, however, each Private Placement Investor executed a Private Placement Subscription Agreement, which included an exclusive Delaware forum selection clause requiring them to bring all claims against Plaintiffs with respect to those purchases in the courts of the State of Delaware.

64.    Because and to the extent that SRCCC purported to serve as the legal representative of all or some of the Private Placement Investors, and to stand in their shoes, bringing claims on their behalf, SRCCC is bound by the Private Placement Subscription Agreements that these Investors executed, including their exclusive Delaware forum selection clause.  Accordingly, the Private Placement Subscription Agreements require SRCCC to bring any and all claims on behalf of Private Placement Investors in the courts of the State of Delaware, and nowhere else.

65.    However, the formation of SRCCC and the SRCCC Letter demonstrate that SRCCC attempted to preserve Dutch law claims in the Netherlands against Plaintiffs on behalf of all CCC investors, including Private Placement Investors, arising out of their purchases

18

of shares in CCC.   Indeed, SRCCC's Articles of Association state that SRCCC intended to conduct an investigation into possible claims against the Carlyle Entities for the purpose of bringing suit against them and authorized SRCCC, *inter alia*, to hire counsel, solicit potential plaintiffs, conduct negotiations with possible defendants, file and litigate lawsuits, and settle claims on a collective basis.

C.      **Plaintiffs' Verified Complaint and the Withdrawal of the Moonmouth and SRCCC Letters**

66.      After receiving the Moonmouth and SRCCC Letters, Plaintiffs retained Dutch counsel and considered how best to respond to Defendants' breaches and threatened breaches of their contractual obligations.   On September 6, 2012, Plaintiffs, joined by the Independent Directors, filed the Verified Complaint, which alleged that (1) the Reijtenbagh Defendants had breached the Releases by preserving and advancing claims in the Netherlands; (2) the Reijtenbagh Defendants intended to breach the exclusive Delaware forum selection clause contained in the Moonmouth Subscription Agreement by bringing suit in the Netherlands; (3) SRCCC intended to breach the exclusive Delaware forum selection clause contained in the Private Placement Subscription Agreements by bringing suit in the Netherlands.   Plaintiffs' Verified Complaint sought declaratory and injunctive relief, as well as monetary damages.

67.      The next day, Plaintiffs provided Defendants, through their Dutch counsel at Lemstra van der Korst, with copies of the Verified Complaint and associated pleadings.   Less than a week later, Lemstra van der Korst responded by disclaiming any intent by Defendants to pursue proceedings against Plaintiffs and abruptly withdrew the Moonmouth and SRCCC Letters.

68.      Plaintiffs' counsel responded to Defendants' Dutch counsel on September 18, 2012, confirming that the withdrawn Moonmouth and SRCCC Letters no longer had any

legal effect in terms of tolling the statute of limitations.  Plaintiffs' counsel also explained that, in light of Defendants' prior actions, Plaintiffs required assurances that there would be no further violations of Defendants' contractual obligations.  Accordingly, Plaintiffs' counsel requested that Defendants agree to a simple and straightforward stipulation and proposed order memorializing the effect of their withdrawal of the Moonmouth and SRCCC Letters and providing Plaintiffs with certain elements of the relief sought in the Verified Complaint.  Specifically, the proposed stipulation sought, *inter alia*, Defendants' agreement that: (a) the Moonmouth and SRCCC Letters no longer had any legal effect; (b) the statute of limitations had run on Defendants' claims; (c) Defendants and their representatives would take no action in any jurisdiction or venue other than the State of Delaware to pursue claims against Plaintiffs with respect to, in connection with, or related in any way to the purchase of shares in CCC.

69.     Defendants' counsel responded on September 21, 2012, agreeing that Defendants' withdrawal of the Moonmouth and SRCCC Letters meant that the Letters had no legal effect and confirming that the withdrawal of the Moonmouth and SRCCC Letters places the parties in the same position as they would have been had the Letters never been sent. Defendants' counsel also disclaimed any intent, now or in the future, to pursue litigation against Plaintiffs in the Netherlands.  However, despite withdrawing the Moonmouth and SRCCC Letters, Defendants refused to enter into a stipulation and proposed order confirming that they would comply with the exclusive Delaware forum selection clause by agreeing to bring any claims with respect to the purchase of CCC shares only in Delaware and agreeing that they would not pursue claims in the Netherlands.

70.     Although the Dutch statute of limitations arguably has now expired and Defendants have said they will not sue Plaintiffs in the Netherlands, because Defendants have

refused to memorialize their agreement to that effect in a formal order of the Court, Plaintiffs have only the informal assurances of Defendants' counsel that Defendants will not attempt to resurrect their Dutch claims and no assurances at all that Defendants will not seek (or are not now seeking) to pursue their claims outside of Delaware in locations other than the Netherlands in breach of both the Releases and the forum selection clause in the Subscription Agreement.

71.     Moreover, the continued existence of SRCCC, the purpose of which is to pursue claims on behalf of CCC shareholders, and SRCCC's refusal to agree to the stipulation and proposed order offered by Plaintiffs memorializing that it will not breach its obligations, leaves open the possibility that SRCCC may breach the Private Placement Subscription Agreement's exclusive Delaware forum selection clause in the future, as it previously sought to do.

72.     Because SRCCC purports to represent all CCC shareholders, including Moonmouth and Parbold, any attempt by the Reijtenbagh Defendants to participate as a member of SRCCC would represent a further effort to circumvent and evade their contractual obligations under the Releases by pursuing through a third party claims they have released and discharged. Such actions by the Reijtenbagh Defendants would constitute a further breach of the Releases.

## IV.   THE REIJTENBAGH DEFENDANTS HAVE BREACHED THE RELEASES BY FUNDING THE LIQUIDATOR ACTION.

73.     Upon information and belief, the Moonmouth Letters do not represent the Reijtenbagh Defendants' first or only attempt to evade their clear contractual obligations under the Releases.  Unable or unwilling to pursue claims in his own name given his status as a fugitive from the Belgian tax authorities, and bound by the Releases, Reijtenbagh apparently decided to pursue his claims through a third-party surrogate in the form of CCC's Joint Liquidators.

21

74.     According to their own public statements, CCC's Joint Liquidators have arranged for and are receiving "tens of millions of dollars" in litigation funding to finance and support the Liquidator Action, including the ongoing Guernsey proceedings.

75.     Upon information and belief, the Reijtenbagh Defendants and/or their affiliates are providing, in whole or in part, the Joint Liquidators' litigation funding in exchange for a share of any recovery obtained by the Joint Liquidators, a preference as a creditor or shareholder in the liquidation of CCC, and/or some other form of valuable consideration, including a potential recovery from the Liquidator Action as a shareholder of CCC.

76.     The Reijtenbagh Defendants' potential ability to recover through the Liquidator Action is demonstrated by the Liquidators' communications with other former CCC shareholders, in which the Liquidators' Guernsey counsel has encouraged such investors to drop lawsuits against CCC and instead to seek recovery through the Guernsey proceedings.

77.     Through his associates, Reijtenbagh has denied funding the Liquidator Action.  Despite these general denials, Plaintiffs have reason to believe that Reijtenbagh's denials were false and that he and/or his affiliates are using the Liquidator Action as a vehicle to pursue claims that he has released.

78.     Plaintiffs' belief is based, in part, on the fact that the Joint Liquidators are represented—and the Guernsey Action is directed—by Australian lawyer Jason Karas and his law firm, Lipman Karas. Mr. Karas and his firm are, respectively, the same lawyer and law firm retained by Reijtenbagh and Plaza in spring 2008 to analyze potential claims against the Carlyle Entities arising out of Moonmouth's investment in CCC.

79.     In addition, according to the Liquidators' website, they have developed their claims against Plaintiffs with input and assistance from lawyers in Australia, the British

Virgin Islands, and New York, all of which are venues associated with the Reijtenbagh Defendants.

80.     Moreover, there are substantial parallels between the Lipman Karas Memo prepared for Reijtenbagh and Plaza by Karas in April 2008 and the complaints drafted at the direction of Lipman Karas and filed by Guernsey counsel in the Liquidator Action in July 2010. For example, both the Lipman Karas Memo and the complaint in the Liquidator Action allege, *inter alia*, that CIM was reckless, grossly negligent, and negligent and breached various fiduciary and other duties because it: (a) failed to maintain an adequate liquidity cushion for CCC; (b) imprudently proceeded with CCC's public offering in July 2007; and (c) failed to preserve investor capital by winding down CCC after August 2007 and returning funds to investors. Upon information and belief, the Lipman Karas Memo, prepared for Reijtenbagh and Plaza, served as a roadmap for the present Liquidator Action, outlining many of the facts, legal theories, and claims subsequently raised in the Liquidator Action.

81.     Plaintiffs' belief is further based, in part, on the fact that Reijtenbagh, who has been identified in the press as a well-known "litigation financier," has a lengthy track record of funding insolvency-related litigation in Australia, where the Joint Liquidators' counsel, Lipman Karas, is based.  Upon information and belief, Reijtenbagh has provided:

(a)     substantial litigation funding for another insolvency-related lawsuit in which Lipman Karas served as lead counsel for the liquidator, a $244 million action brought by the liquidator of failed Australian telecommunications company One.Tel against the firm's former directors, *see* Andrew Main, *Rich Calls Off Case Against Packer, Murdoch*, THE

23

AUSTRALIAN, September 15, 2010; Katherine Jimenez, *Dutch Millionaire Behind One.Tel Legal Action*, THE AUSTRALIAN, August 27, 2010;[3]

(b)     in excess of $10 million in funding over a five-year period in support of a $1.5 billion lawsuit by the liquidator of the failed Australian firm Bell Group against the company's former bankers, *see* Vanda Carson, *Man Who Funded Case Against Bond's Banks In Art Scandal*, SYDNEY MORNING HERALD, May 19, 2009;

(c)     substantial litigation funding for a $50 billion lawsuit brought by Australian company Idoport Pty. Ltd. and Australian businessman John Maconochie against National Australia Bank Ltd., *see id.*; and

(d)     substantial litigation funding for a $100 million lawsuit pursued by the liquidator of the failed Australian firm Moage Ltd., *see* Elisabeth Sexton, *Weston States Silent On Who Is Funding Damages Claim*, SYDNEY MORNING HERALD, August 27, 2010.

82.    Plaintiffs' belief that the Reijtenbagh Defendants and/or their affiliates are funding the Liquidator Action recently was reinforced by Defendants' response to Plaintiffs' Verified Complaint. As alleged above, after receiving notice of Plaintiffs' Verified Complaint on September 7, 2012, Defendants' counsel withdrew the Moonmouth and SRCCC Letters one week later, denying any intent to pursue proceedings in the Netherlands, and refused to accept service.

---

[3]  The Trustee in the One.Tel matter, who is represented by Lipman Karas, recently was removed by an Australian court for a lack of objectivity toward creditors, failure to expend the estate's resources properly, and pursuit of "inappropriate investigations" and claims. Leo Shanahan, *One.Tel Liquidator Sacked By NSW Supreme Court*, THE AUSTRALIAN, June 20, 2012.

83.     Defendants' abrupt withdrawal of the Moonmouth and SRCCC Letters was surprising in light of the considerable steps Defendants already had taken in pursuit of their claims.   In addition to engaging Dutch counsel, investigating the facts and circumstances surrounding CCC, and drafting the detailed Moonmouth and SRCCC Letters, Defendants also created a special-purpose vehicle, SRCCC, for the purpose of litigating claims related to CCC. Defendants' willingness to abandon their claims in the Netherlands so quickly, which would avoid any discovery into the extent of other possible breaches, combined with their established track record of funding litigation and the involvement of their Australian counsel, strongly suggests that Defendants are simultaneously pursuing similar relief by funding the Guernsey Liquidator Action.   By funding and supporting the Liquidator Action in exchange for valuable consideration, Reijtenbagh individually and/or certain of the other Reijtenbagh Defendants have breached and are continuing to breach the Releases.

84.     The Releases each extinguished any and all claims the Reijtenbagh Defendants had or may have had against Plaintiffs, including all claims related in any way to CCC.   Yet, upon information and belief, the Reijtenbagh Defendants now are pursuing their released claims using the Liquidator Action as an intermediary.   The Reijtenbagh Defendants should not be permitted to evade their contractual obligations under the Releases by hiring third parties to pursue claims on their behalf and/or for their benefit, after having waived those claims.

85.     As a result of the Reijtenbagh Defendants' breach of the Releases, Plaintiffs have incurred millions of dollars in damages in the form of costs, attorneys' fees, and expenses associated with defending against the Liquidator Action that would not have been suffered in the absence of the Reijtenbagh Defendants' breaches.   Plaintiffs also have incurred and will in the future incur non-compensable losses in the form of the burdens associated with

25

litigating claims that have been released and will incur additional irreparable injuries because they are being forced to litigate in a non-contractual forum. Accordingly, Plaintiffs are entitled to monetary damages as well as declaratory and injunctive relief.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF RELEASES
### Against The Reijtenbagh Defendants

86.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs of this First Amended Verified Complaint as if fully set forth herein.

87.     Each of the Transfer Agreements is a valid and binding contract. The Releases included in the Transfer Agreements are valid and binding contractual provisions. Any and all conditions precedent to the enforcement of the Transfer Agreements and the Releases contained therein have been performed and/or satisfied.

88.     In the Releases, the Reijtenbagh Defendants fully released and discharged Plaintiffs from any and all claims that any of the Reijtenbagh Defendants had or may have had against them as of the dates the Releases were executed. By doing so, the Reijtenbagh Defendants fully released any and all claims they had or may have had against Plaintiffs arising out of or relating in any way to Moonmouth's investment in CCC.

89.     The Reijtenbagh Defendants have violated the Releases by taking a number of steps to advance claims, either directly or indirectly, against Plaintiffs, including among other things sending the Moonmouth Letter, creating SRCCC, and directing the transmission of the SRCCC Letter. The Moonmouth and SRCCC Letters, the formation of SRCCC, and the retention of Lemstra van der Korst, among other things, constitute affirmative steps in the advancement of such claims and are therefore breaches of the Releases.

26

90.    As a result of the Reijtenbagh Defendants' breach of the Releases, Plaintiffs have suffered damages in the form of costs and attorneys' fees associated with retaining Dutch counsel that would not have been incurred in the absence of the Reijtenbagh Defendants' breaches.

91.    Despite the withdrawal of the Moonmouth Letter, Plaintiffs have no assurances that the Reijtenbagh Defendants will not in the future again breach the Releases.  If the Reijtenbagh Defendants are not enjoined from breaching the Releases and are able to pursue claims against Plaintiffs that have been fully released and discharged, Plaintiffs will continue to suffer substantial and irreparable harm.

92.    Additionally, upon information and belief, the Reijtenbagh Defendants and/or their affiliates are funding (in whole or in part) the Liquidator Action in exchange for valuable consideration.  The Reijtenbagh Defendants' funding of (and thus, participation in) the Liquidator Action constitutes a further breach of the Releases.  Moreover, if the Joint Liquidators prevail in the Liquidator Action, certain of the Reijtenbagh Defendants may stand to recover as shareholders of CCC based on claims that they fully released and discharged through the Releases.  Accordingly, the Reijtenbagh Defendants have breached the Releases by funding the Liquidator Action.

93.    Plaintiffs have incurred substantial monetary damages as a result of the Reijtenbagh Plaintiffs' funding of the Liquidator Action that they would not otherwise have incurred.  Additionally, the Reijtenbagh Defendants' funding of the Liquidator Action is causing Plaintiffs irreparable harm.  Plaintiffs therefore are entitled to monetary damages to compensate them for the Reijtenbagh Defendants' breach of the Releases as well as any other appropriate and available form of relief, including declaratory and injunctive relief.

**COUNT II**
**DECLARATORY AND INJUNCTIVE RELIEF FOR BREACH OF THE FORUM**
**SELECTION CLAUSE**
**Against The Reijtenbagh Defendants**

94.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs of this First Amended Verified Complaint as if fully set forth herein.

95.     The Moonmouth Subscription Agreement, including its forum selection clause, is a valid and binding contract.  Any and all conditions precedent to the enforcement of the Moonmouth Subscription Agreement and its forum selection clause have been performed or satisfied.  The forum selection clause in the Moonmouth Subscription Agreement is reasonable and enforcement thereof would be just and consistent with equitable principles.

96.     The Moonmouth Subscription Agreement's forum selection clause requires the Reijtenbagh Defendants to bring any action, suit, or proceeding with respect to the Moonmouth Subscription Agreement in Delaware.   However, the Moonmouth Letter demonstrates that the Reijtenbagh Defendants were preparing to breach the clause by bringing claims outside Delaware. Despite withdrawing the Moonmouth Letter, the Reijtenbagh Defendants have refused to agree that any such actions, suits, or proceedings will be brought only in Delaware, leaving Plaintiffs with only the Reijtenbagh Defendants' informal assurances that they will not breach the forum selection clauses in the future.   An actual controversy between Plaintiffs and the Reijtenbagh Defendants therefore exists with respect to the rights of the parties to the Moonmouth Subscription Agreement and their affiliates.

97.     If the Reijtenbagh Defendants breach the Moonmouth Subscription Agreement's forum selection clause by bringing the claims outlined in the Moonmouth Letter in any non-Delaware forum, Plaintiffs will suffer irreparable harm because they previously

bargained for and agreed to litigate all claims with respect to the Moonmouth Subscription Agreement exclusively in Delaware.

98.    Additionally, Plaintiffs have incurred substantial expense as a result of Plaintiffs' actions to date and will incur substantial monetary damages if the Reijtenbagh Defendants breach the clause.   If the Reijtenbagh Defendants breach the Moonmouth Subscription Agreement's forum selection clause, Plaintiffs will be entitled to recover those damages.

99.    Declaratory and injunctive relief prohibiting the Reijtenbagh Defendants from breaching the Moonmouth Subscription Agreement's forum selection clause is therefore necessary and proper under the circumstances of this case and such relief will terminate the uncertainty or controversy between the parties giving rise to this claim.

**COUNT III**
**DECLARATORY AND INJUNCTIVE RELIEF FOR BREACH OF THE FORUM SELECTION CLAUSES**
**Against Defendant SRCCC**

100.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs of this First Amended Verified Complaint as if fully set forth herein.

101.    The Private Placement Subscription Agreements, including their forum selection clauses, are each valid and binding contracts.   Any and all conditions precedent to the enforcement of the Private Placement Subscription Agreements and their forum selection clauses have been performed or satisfied.   The forum selection clauses in the Private Placement Subscription Agreements are reasonable and enforcement thereof would be just and consistent with equitable principles.

102.    The Private Placement Subscription Agreements' forum selection clauses require all Private Placement Investors to bring all claims with respect to the Private Placement

29

Subscription Agreements in Delaware.   SRCCC purports to represent the legal rights and interests of all investors in CCC, including the Private Placement Investors.   To the extent SRCCC seeks to act on behalf of the Private Placement Investors, SRCCC is bound by the Private Placement Subscription Agreement, including its forum selection clause, to the same extent as the Private Placement Investors.

103.   The SRCCC Letter demonstrates that SRCCC was preparing to bring Dutch law claims on behalf of Private Placement Investors against the Plaintiffs, which are with respect to the Private Placement Subscription Agreement, in a proceeding in the Netherlands. Despite the withdrawal of the SRCCC Letter, SRCCC remains in existence and able to pursue litigation on behalf of CCC shareholders.   Moreover, Defendants have refused to agree to the entry of an order providing that that any action, suit, or proceeding by SRCCC on behalf of CCC shareholders will be brought only in Delaware, leaving Plaintiffs with only SRCCC's informal assurances that it will not breach the forum selection clauses in the future.   An actual controversy between Plaintiffs and SRCCC therefore exists with respect to the rights of Plaintiffs and SRCCC under the Private Placement Subscription Agreements.

104.   If SRCCC breaches the Private Placement Subscription Agreements' forum selection clauses by bringing the claims outlined in the SRCCC Letter in any non-Delaware forum, Plaintiffs will suffer irreparable harm because they previously bargained for and agreed to litigate all claims with respect to the Private Placement Subscription Agreements in Delaware.

105.   Additionally, Plaintiffs have incurred substantial expense as a result of SRCCC's actions to date and will incur substantial monetary damages if SRCCC breaches the forum selection clause, including attorneys' fees and costs associated with bringing these

proceedings to enforce their contractual rights.   If SRCCC breaches the Private Placement Subscription Agreements' forum selection clause, Plaintiffs will be entitled to recover those damages.

106.   Declaratory and injunctive relief prohibiting SRCCC from breaching the Private Placement Subscription Agreements' forum selection clauses is necessary and proper under the circumstances of this case and such relief will terminate the uncertainty or controversy giving rise to this proceeding.

WHEREFORE, Plaintiffs respectfully request the following relief:

## DECLARATORY RELIEF:

A.     A declaration that each of the Releases is a valid, binding, and enforceable contractual agreement,

B.     A declaration that the Reijtenbagh Defendants have released any and all claims they had or may have had against Plaintiffs arising out of or related in any way to the facts and circumstances set forth in the Moonmouth Letter, including any and all claims arising out of, derivative of, or related in any way to Moonmouth's investment in CCC,

C.     A declaration that the Reijtenbagh Defendants have breached the Releases by taking steps in the Netherlands in advancement of claims against Plaintiffs that have been released,

D.     A declaration that the Reijtenbagh Defendants have breached the Releases by funding the Liquidator Action,

E.     A declaration that the Private Placement Subscription Agreements and the Moonmouth Subscription Agreement, including their forum selection clauses, are valid, binding, and enforceable contractual agreements,

31

F.    A declaration that any claims the Reijtenbagh Defendants may have arising from or relating to Moonmouth's investment in CCC are with respect to the Moonmouth Subscription Agreement and that the Reijtenbagh Defendants (or their transferees or successors in interest) therefore may bring those claims only in Delaware,

G.    A declaration that SRCCC is purporting to act on behalf of the Private Placement Investors and, therefore, is bound by the Private Placement Subscription Agreements, including their forum selection clause, to the same extent as the Private Placement Investors,

H.    A declaration that any claims SRCCC may bring on behalf of Private Placement Investors arising out of or relating to their investment in CCC are with respect to the Private Placement Subscription Agreements and, therefore, SRCCC must pursue any such claims on behalf of Private Placement Investors solely in Delaware,

**INJUNCTIVE RELIEF:**

I.    Preliminary and permanent injunctive relief specifically enforcing the Releases and prohibiting the Reijtenbagh Defendants, or any of their affiliates, transferees, or successors in interest, from bringing any claims or pursuing any litigation, or assisting the pursuit of any litigation or claims, whether directly or indirectly, arising out of, derivative of, or related in any way to Moonmouth's purchase of shares in CCC, against Plaintiffs, including but not limited to the funding of the Liquidator Action,

J.    Preliminary and permanent injunctive relief specifically enforcing the forum selection clauses and enjoining the Reijtenbagh Defendants, or any of their affiliates, transferees, or successors in interest, from bringing any claims or pursuing any litigation, whether directly or indirectly, outside of Delaware that arises out of or relates in any way to Moonmouth's purchase of shares in CCC,

K.      Preliminary and permanent injunctive relief enjoining SRCCC, or any of its affiliates or agents, or those over whom it exercises control, whether directly or indirectly, from bringing any claims or pursuing any litigation outside of Delaware that arises out of or relates in any way to Private Placement Investors' purchases of shares in CCC,

**MONETARY RELIEF:**

L.      Money damages in the form of costs, attorneys' fees, and expenses incurred by Plaintiffs in connection with the Reijtenbagh Defendants' breaches of the Releases,

M.      Attorneys' fees and costs associated with bringing this action, and

N.      Such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Angela C. Whitesell
R. Judson Scaggs, Jr. (#2676)
Kevin M. Coen (#4775)
Angela C. Whitesell (#5547)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
*Attorneys for Plaintiffs Carlyle Investment Management, L.L.C., TC Group, L.L.C., TCG Holdings, L.L.C., David M. Rubenstein, Daniel A. D'Aniello, William E. Conway, Jr., James H. Hance, John C. Stomber, Michael J. Zupon,*

OF COUNSEL:

Robert A. Van Kirk
R. Hackney Wiegmann
Sarah F. Teich
Brian C. Rabbitt
WILLIAMS & CONNOLLY  LLP
725 12th Street, N.W.
Washington, DC 20005
(202) 434-5000

Dated:  October 23, 2012

33

EFiled: Oct 23 2012 09:52PM EDT
Transaction ID 47292553
Case No. 7841-CS

# EXHIBIT A

IN THE COURT OF CHANCERY ~~FOR~~ OF THE STATE OF DELAWARE

| | |
|---|---|
| CARLYLE INVESTMENT MANAGEMENT, L.L.C., TC GROUP, L.L.C., TCG HOLDINGS, L.L.C., DAVID M. RUBENSTEIN, DANIEL A. D'ANIELLO, WILLIAM E. CONWAY, JR., JAMES H. HANCE, JOHN C. STOMBER, and MICHAEL J. ZUPON, ~~ROBERT B. ALLARDICE III, HARVEY J. SARLES, and JOHN L. LOVERIDGE,~~ | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )     C.A. No. **7841-CS** |
| MOONMOUTH COMPANY S.A., PLAZA MANAGEMENT OVERSEAS S.A., PARBOLD OVERSEAS LTD., LOUIS J.K.J. REIJTENBAGH, and STICHTING RECOVERY CCC, | ) ) ) ) ) ) |
| Defendants. | ) |

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiffs Carlyle Investment Management L.L.C. ("CIM"), TC Group, L.L.C. ("TC Group"), TCG Holdings, L.L.C. ("TCGH") (collectively, the "Carlyle Entities"), David M. Rubenstein, Daniel A. D'Aniello, William E. Conway, Jr., James H. Hance, John C. Stomber, and Michael J. Zupon (collectively~~,~~ with the Carlyle Entities, ~~the "Carlyle Plaintiffs"), Robert B. Allardice III, Harvey J. Sarles, and John L. Loveridge (collectively, the "Independent Directors") (collectively, with the Carlyle Plaintiffs~~, "Plaintiffs"), by their attorneys, for their First Amended Verified Complaint, upon knowledge as to themselves and their own conduct, and otherwise upon information and belief, allege as follows:

## INTRODUCTION

1.    In 2009, Defendants Moonmouth Company S.A. ("Moonmouth"), Plaza Management Overseas, S.A. ("Plaza"), Parbold Overseas, Ltd. ("Parbold"), and Louis J.K.J. Reijtenbagh ("Reijtenbagh") (collectively, the "Reijtenbagh Defendants") released any and all claims they had or may have had against ~~the Carlyle~~ Plaintiffs, including any and all claims arising out of or related to Moonmouth's 2006 investment in Carlyle Capital Corporation, Ltd. ("CCC").

2.    Undeterred by their contractual obligations, the Reijtenbagh Defendants ~~now are pursuing~~sought to pursue such claims against Plaintiffs in the Netherlands relating to their investment in CCC. By doing so, the Reijtenbagh Defendants ~~have~~ breached ~~and are continuing to breach not only the releases~~the Releases (as defined below) to which they agreed in 2009, ~~but~~and also threatened to breach a valid and enforceable forum selection clause to which they separately agreed that requires them to bring all claims with respect to their CCC investment only in Delaware.

3.    Similarly, Defendant Stichting Recovery CCC ("SRCCC"), a Dutch entity represented by Reijtenbagh's attorneys which purports to represent the interests of CCC shareholders ~~who signed identical agreements, currently is preparing~~, including the Reijtenbagh Defendants, who agreed to identical forum selection clauses, sought to bring similar claims in the Netherlands in violation of the same exclusive Delaware forum selection clause.

4.    These breaches ~~have~~and threatened breaches caused ~~and will continue to cause~~ Plaintiffs to suffer ~~losses that are compensable by~~ damages ~~and other losses that are irreparable.~~ Accordingly, on September 6, 2012, Plaintiffs filed a verified complaint (the "Verified Complaint") in this Court seeking to hold Defendants ~~should be held~~ to account for their breaches and ~~should be enjoined~~requesting that the Court enjoin them from further violations of their contractual promises.

5.    After receiving notice of Plaintiffs' Verified Complaint, Defendants retreated from their prior statements and actions, disclaiming an intent to pursue claims against Plaintiffs in the Netherlands now or in the future. They refused, however, to memorialize the withdrawal of their claims in a formal stipulation and proposed order. In addition, Defendants' immediate rescission of their claims in response to the Verified Complaint gave Plaintiffs additional reason to believe that the Reijtenbagh Defendants are pursuing similar relief through other mechanisms in other fora, in violation of both the Releases and the exclusive Delaware forum selection clause to which they agreed.

**PARTIES**

6.    5. Plaintiff Carlyle Investment Management L.L.C. ("CIM") is a Delaware limited liability company with its principal places of business in the District of Columbia and New York. Between August 29, 2006 and March 17, 2008, CIM served as the investment manager of CCC. CIM is an affiliate of Plaintiffs TC Group and TCGH.

7.    6. Plaintiff TC Group, L.L.C. ("TC Group") is a Delaware limited liability company with its principal place of business in the District of Columbia. TC Group is an affiliate of Plaintiffs CIM and TCGH. "The Carlyle Group" is a trade name for TC Group.

8.    7. Plaintiff TCG Holdings, L.L.C. ("TCGH") is a Delaware limited liability company with its principal place of business in the District of Columbia. TCGH is an affiliate of Plaintiffs CIM and TC Group.

9.    8. Plaintiff David M. Rubenstein ("Rubenstein") is a founding partner, co-founder and managing director, and co-chief executive officer of The Carlyle Group.

10.    9. Plaintiff Daniel A. D'Aniello ("D'Aniello") is a founding partner, co-founder and managing director, and chairman of The Carlyle Group.

11.   10.  Plaintiff William E. Conway, Jr. ("Conway") is a ~~founding partner,~~ co-founder and managing director~~, and co-chief executive officer~~ of The Carlyle Group. Conway served as a director of CCC.

12.   11.  Plaintiff James H. Hance ("Hance") is an operating executive of The Carlyle Group and its affiliated entities. Hance served as the non-executive chairman of CCC's board of directors.

13.   12.  Plaintiff John C. Stomber ("Stomber") was a managing director of Plaintiff CIM, and served as chief executive officer, president, and chief investment officer of CCC. He also served as a non-voting director of CCC.

14.   13.  Plaintiff Michael J. Zupon ("Zupon") was a founding member, chief investment officer, and managing director of The Carlyle Group's U.S. leveraged finance business unit. He served as a non-voting director of CCC and as the non-executive vice chairman of CCC's board.

~~14.   Plaintiff Robert B. Allardice III ("Allardice") served as an independent director of CCC.~~

~~15. Plaintiff Harvey J. Sarles ("Sarles") served as an independent director of CCC.~~

~~16.   Plaintiff John L. Loveridge ("Loveridge") served as an independent director of CCC.~~

15.   17.  Defendant Moonmouth is a company organized under the laws of the British Virgin Islands with its registered office in Tortola, British Virgin Islands. Upon information and belief, Moonmouth is an investment entity owned and controlled by Defendant Louis Reijtenbagh and is an affiliate of Defendants Plaza and Parbold.

16.   18. Defendant Plaza is a privately held investment company organized under the laws of the British Virgin Islands with its registered office and a place of business in Tortola, British Virgin Islands.   Upon information and belief, Plaza is wholly owned and controlled by Defendant Louis Reijtenbagh. Plaza is an affiliate of Defendants Moonmouth and Parbold.

17.   19. Defendant Parbold is a company organized under the laws of the British Virgin Islands with its registered office and a place of business in Tortola, British Virgin Islands.   Upon information and belief, Parbold is an investment entity controlled by Defendant Louis Reijtenbagh and an affiliate of Defendants Plaza and Moonmouth.

18.   20. Defendant Louis J.K.J. Reijtenbagh is a Dutch citizen.   Upon information and belief, he resides in Monte Carlo, Principality of Monaco and/or Hong Kong, People's Republic of China.  He is the owner, President, and chief executive officer of Plaza and the beneficial owner of Moonmouth and Parbold.  Upon information and belief, Reijtenbagh controls Plaza, Moonmouth, Parbold and numerous other related investment entities.

19.   21. Defendant Stichting Recovery CCC ("SRCCC") is an entity incorporated under Dutch law with its registered office in The Netherlands.  Upon information and belief, SRCCC was created by or at the instigation of Reijtenbagh or his affiliates.  SRCCC's articles of association state that SRCCC's purpose is to represent the interests of shareholders of CCC.

## FACTUAL ALLEGATIONS

I.       **Carlyle Capital Corporation**

20.   22. Plaintiffs TC Group, TCGH, and CIM are part of a group of entities that collectively comprise The Carlyle Group, a global private equity firm that manages a number of

investment funds across a variety of investment disciplines.  CIM is an affiliate of TC Group and is the vehicle through which certain such funds are managed.  TCGH is a holding company, with no operational activities or responsibilities, and is an affiliate of CIM and TC Group.

21.  ~~23.~~ On August 29, 2006, CCC was organized as a limited company under the laws of the Island of Guernsey, Channel Islands.  CCC was an investment fund that primarily held AAA-rated residential mortgage backed securities ("RMBS"), which were backed by home mortgages located in the United States and guaranteed by Fannie Mae and Freddie Mac.  CCC commenced operations in September 2006.  CIM served as the investment manager for CCC from its incorporation until CCC was placed into liquidation on March 17, 2008.

### A.     The CCC Subscription Agreement's Delaware Forum Selection Clause

22.  ~~24.~~ Beginning in September 2006 and continuing through February 2007, investors were able to purchase CCC Class B shares through several rounds of private placements. All investors who purchased shares in CCC through these private offerings (the "Private Placement Investors") were required to execute substantively identical subscription agreements to effectuate their purchases (the "Private Placement Subscription Agreements").  All properly executed Private Placement Subscription Agreements were and remain valid and binding contracts.  ~~True and correct examples of the Private Placement Subscription Agreements as distributed to U.S. investors and non-U.S. investors are attached hereto as Exhibits 1 and 2, respectively.~~ CCC's private placements raised a total of $600 million in capital for the company.

23.  ~~25.~~ In July 2007, CCC held a global offering, in which shares were offered to institutions and persons meeting certain criteria, and its Class B shares were listed on the EuroNext exchange in Amsterdam.  The offering raised a total of $345 million in new capital for CCC.

24.   26.—Defendant Reijtenbagh is a wealthy Dutch individual with homes and investment offices in New York City, the British Virgin Islands, Australia, Hong Kong, and across Europe.  Reijtenbagh has, over time, made substantial investments in numerous funds affiliated with The Carlyle Group, including Carlyle Partners V, L.P. ("CPV") and Carlyle Europe Partners III, L.P. ("CEP III").

25.   27.—On or about December 20, 2006, Reijtenbagh, acting through Defendant Plaza, caused Defendant Moonmouth to execute a Private Placement Subscription Agreement (the "Moonmouth Subscription Agreement") in connection with Moonmouth's investment of $60 million in CCC.  In exchange for its investment, Moonmouth received three million (3,000,000) Class B shares in CCC.  Upon information and belief, in 2007, Reijtenbagh caused Moonmouth to transfer one million (1,000,000) of the CCC Class B shares that Moonmouth purchased to Defendant Parbold.

26.   28.—On or about December 28, 2006, Plaintiff Stomber countersigned the Moonmouth Subscription Agreement for CIM as the investment manager for CCC.  The Moonmouth Subscription Agreement was and remains a valid and binding contract. A true and correct copy of the executed Moonmouth Subscription Agreement is attached as Exhibit 3.

27.   29.—The Moonmouth Subscription Agreement contains an exclusive Delaware forum selection clause that provides in pertinent part as follows:

> The courts of the State of Delaware shall have exclusive jurisdiction over any action, suit or proceeding with respect to this Subscription Agreement and the Investor hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may have, whether now or in the future, to the laying of venue in, or to the jurisdiction of, any and each of such courts for the purposes of any such suit, action, proceeding or judgment and further waives any claim that any such suit, action, proceeding or judgment has been brought in an inconvenient forum, and the Investor hereby submits to such

jurisdiction.

~~See Ex. 3 (Moonmouth Subscription Agreement) § 8.~~ An identical exclusive Delaware forum selection clause appears in each and every Private Placement Subscription Agreement. ~~See Ex. 1 (Subscription Agreement — U.S. Investors) § 8; Ex. 2 (Subscription Agreement — Non-U.S. Investors) § 8.~~

28. ~~30.~~ The~~As this Court has held, this very~~ exclusive Delaware forum selection clause, which is contained in every Private Placement Subscription Agreement, including the Moonmouth Subscription Agreement, is a valid and ~~binding provision.~~ A~~s~~enforceable provision. *See Carlyle Investment Management, L.L.C. v. National Industries Group (Holding)*, C.A. No. 5597-CS, 2012 WL 4847089, at *7-11 (Del. Ch. Ct. Oct. 11, 2012). Moreover, as this Court has explained, and as two federal courts have ~~held~~confirmed, the "with respect to" language used in these forum selection clauses is "broad" and encompasses not only claims for breach of the Private Placement Subscription Agreements, but also all common law and statutory claims relating in any way to Private Placement Investors' investments in CCC. *See id.* at *12 n. 103; *see also Huffington v. T.C. Grp., LLC*, 685 F. Supp. 2d 239 (D. Mass 2010), *aff'd*, 637 F.3d 18 (1st Cir. 2010). The forum selection clause thus requires each Private Placement Investor and its affiliates, including Defendants, to bring any and all claims they may have with respect to their investment in CCC only in the courts of the State of Delaware.

29. ~~31.~~ By agreeing to the "exclusive jurisdiction" of the "courts of the State of Delaware," and by the ~~express~~ terms of the contract, all Private Placement Investors and their affiliates, including Defendants, "irrevocably waive[d], to the fullest extent permitted by law, any objection that [they] may have . . . to the laying of venue in, or to the jurisdiction of, any and each

of such courts." ~~See Exs. 1, 2, 3 (Subscription Agreements) § 8.~~ This waiver encompasses any right to remove this case to federal court.

30. ~~32.~~ The Private Placement Subscription Agreements also included a clause providing that the agreement "shall be binding upon the Investor and the heirs, personal representatives, successors, and assigns of the Investor" as well as a Delaware choice of law clause requiring that the agreement "shall be governed, construed and enforced solely under the laws of the State of Delaware[.]" ~~See Exs. 1, 2, 3 (Subscription Agreements) § 7.~~

**B.   CCC Is Placed Into Liquidation**

31. ~~33.~~ CCC's investment portfolio was comprised principally of AAA-rated RMBS, which carried the express guarantee of Fannie Mae and Freddie Mac and the implied guarantee of the U.S. government.  The securities in which it invested involved no sub-prime mortgages.  In March 2008, however, the U.S. financial markets experienced a sudden and extreme liquidity crisis, resulting in unprecedented instability in both the valuation of CCC's assets and its financing for those assets.  As a result, CCC's cash reserves (known as its "liquidity cushion") were depleted.  On or around March 6, 2008, CCC defaulted on certain of its financing agreements with some of its counterparties.

32. ~~34.~~ On March 17, 2008, CCC was placed into liquidation by the Royal Court of Guernsey and several liquidators (the "Joint Liquidators") were appointed to oversee CCC's affairs and winding-up.  On September 29, 2009, the Joint Liquidators announced that investors in CCC, including Moonmouth and the other Private Placement Investors, were unlikely to receive any distribution from CCC in the liquidation.

33. ~~35.~~ On July 7, 2010, CCC's Joint Liquidators filed four substantively identical lawsuits against Plaintiffs in New York, Washington, D.C., Delaware and Guernsey

(collectively, the "Liquidator Action"). The Liquidator Action alleged various breaches of duties and sought in excess of $1 billion in damages.

**II.      The Reijtenbagh Defendants Release All Claims Against ~~the Carlyle~~ Plaintiffs**

    **A.      Reijtenbagh and Plaza Identified Potential Claims against the Carlyle Entities**

       34.   ~~36.~~ Sometime after CCC was placed into liquidation and after Carlyle initiated discussions with investors about ways they could recoup some of their losses, Defendants Plaza and Reijtenbagh retained Lipman Karas, an Australian law firm, to analyze potential claims that might be made against the Carlyle Entities arising out of Moonmouth's investment in CCC.

       35.   ~~37.~~ Upon information and belief, Reijtenbagh, his family, and his affiliates have worked with Lipman Karas partner Jason Karas in a number of other legal matters unrelated to CCC. For example, Reijtenbagh reportedly provided substantial litigation funding for an Australian lawsuit brought by Lipman Karas on behalf of the liquidator of One.Tel, a failed Australian telecommunications company. *See* Katherine Jimenez, *Dutch Millionaire Behind One.Tel Legal Action*, THE AUSTRALIAN, August 27, 2010 ~~(attached hereto as Exhibit 4)~~.

       36.   ~~38.~~ Karas and his law firm prepared a memorandum for Plaza asserting that the Carlyle Entities had mismanaged CCC and outlining possible legal claims that Plaza might be able to bring against the Carlyle Entities, (the "Lipman Karas Memo"). In the course of discussing potential CCC-related claims that Plaza might have, Reijtenbagh provided a copy of the Lipman Karas Memo to representatives of Carlyle.

       37.   ~~39.~~ After initial discussions about resolving these and other Carlyle-related issues were not productive, Defendants Reijtenbagh, Moonmouth, and Plaza indicated that they were considering bringing suit against the Carlyle Entities and their affiliates in connection with

the failure of CCC.  However, Reijtenbagh subsequently indicated he did not intend to pursue his claims at that time, and no complaint was ever filed.

**B.      Reijtenbagh and His Affiliates Encountered Legal and Financial Problems**

38.      40.  At one point, Reijtenbagh, his family, and their affiliated investment entities were reported to control in excess of $1 billion in investments, including hundreds of millions of dollars of investments held in various funds run by and/or affiliated with the Carlyle Entities.  In 2009, however, Reijtenbagh and his affiliates, including Plaza, encountered serious legal and financial difficulties.

39.      41.  In February 2009, it was reported in the media that Belgian tax authorities had obtained a judgment in the amount of approximately €180 million against Reijtenbagh for evading Belgian taxes by fraudulently claiming residence in Monaco and that police had raided his home to seize assets and search for evidence.  It also was reported that Reijtenbagh subsequently fled the country and went into hiding.  Belgian authorities later seized approximately €120 million of his assets in partial satisfaction of the outstanding tax obligations.  A Belgian court subsequently approved this asset seizure.

40.      42.  The Belgian tax judgment was not Reijtenbagh's only legal and financial problem.  In spring 2009, it was reported that various private equity funds in which Reijtenbagh and his affiliates were invested began marking down their holdings in the midst of the broader global financial crisis.  Because Reijtenbagh and his affiliates had borrowed substantial amounts from various financial institutions to finance their investments, these markdowns put Reijtenbagh and his affiliates at risk of substantial collateral calls from lenders such as Credit Suisse, which had provided them with over $700 million in financing. *See* Nathan Vardi, *Dr. Debt*, FORBES, May 25, 2009.

41. 43.—On or about March 13, 2009, Plaza and several affiliated entities, including Bundora Associates, Inc. ("Bundora"), commenced insolvency proceedings in the British Virgin Islands. Certain of Reijtenbagh's investments in funds managed by the Carlyle Entities were owned through Bundora, which is an affiliate of Plaza and Moonmouth and which is owned and controlled by Reijtenbagh. A court in the British Virgin Islands appointed Plaza as the foreign representative of these Reijtenbagh-affiliated entities, and Plaza commenced Chapter 15 bankruptcy proceedings in the United States Bankruptcy Court for the District of New Jersey on March 18, 2009.

42. 44.—On or about March 24, 2009, several entities affiliated with Credit Suisse filed suit in New York state court (the "CS Action") against, *inter alia*, Plaza, Louis Reijtenbagh and his two sons, Jacco and Edgar Reijtenbagh. The lawsuit alleged that the Reijtenbaghs and their affiliates had engaged in a "brazen conspiracy . . . to cheat and deceive on an unmatched scale." Compl. ¶ 6, *CS Structured Strategies B, L.P., et al. v. Louis J.K.J. Reijtenbagh, et al.*, No. 09600910 (N.Y. Sup. Ct. March 24, 2009) (attached hereto as Exhibit 5). According to the CS Action complaint, Reijtenbagh and his affiliates had pledged their interests in various private equity funds as collateral for over $700 million in financing provided by the CS Action plaintiffs. The complaint further alleged that Reijtenbagh and his affiliates then fraudulently transferred $340 million-worth of this collateral to other entities controlled by Reijtenbagh in a series of sham transfers. Based on this scheme, the CS Action asserted claims for fraudulent misrepresentation, aiding and abetting fraud, fraudulent transfer based on actual and constructive fraud, and tortious interference with contract. The CS Action plaintiffs sought damages in excess of $340 million. A New York state court subsequently entered a temporary

restraining order freezing Reijtenbagh's assets.       That order was later modified to allow the

CS Action defendants to transfer certain assets to settle the CS Action.

        <u>43.</u>    45.—Similarly, on or about April 1, 2009, JPMorgan Chase Bank, N.A.

("JPMorgan") filed a separate lawsuit in New York state court against Louis, Jacco, and Edgar

Reijtenbagh and Monte-Carlo Art S.A., another entity owned and controlled by the Reijtenbagh

family.  JPMorgan had provided Reijtenbagh and his affiliates with a $50 million revolving credit

facility, which was secured by numerous works of fine art owned by Reijtenbagh (directly or

through his affiliates) and located in Jacco and Edgar Reijtenbagh's New York apartment.

Referencing the CS Action, JPMorgan's lawsuit alleged that "Louis Reijtenbagh and his

companies have experienced a material adverse change in [their] business and [their] financial

condition," causing Reijtenbagh to default on approximately $23 million owed to JPMorgan under

the credit facility.  Compl. ¶¶ 36-37, *JPMorgan Chase Bank, N.A. v. Louis J.K.J. Reijtenbagh, et

al.*, No. 601001 (N.Y. Sup. Ct. April 1, 2009) ~~(attached hereto as Exhibit 6)~~.  JPMorgan's lawsuit

further alleged that the Reijtenbaghs had refused to surrender over $40 million-worth of fine art

that served as collateral for the loans and had wrongfully moved some of the collateral to a location

outside the United States, in violation of various agreements.

        <u>44.</u>    46.—Dutch bank ABN Amro also had provided Reijtenbagh and his

affiliates with approximately €52 million in financing.  Like the JPMorgan credit facility, the ABN

Amro financing was secured by numerous pieces of fine art, including some of the same artwork

that was pledged as collateral to JPMorgan.  In or about April 2009, ABN Amro filed suit against

Reijtenbagh and his affiliates in the Netherlands to secure the collateral.  A Dutch court later

ordered Reijtenbagh to pay ABN Amro more than €25 million.  In fall 2009, ABN Amro seized

more than 60 pieces of Reijtenbagh's artwork.[1]

**C.    The Reijtenbagh Defendants Release All Claims Against ~~the Carlyle~~ Plaintiffs**

45.     ~~47.~~ Upon information and belief, the events described in paragraphs ~~40~~39

to ~~46~~44 and other circumstances left Reijtenbagh and his affiliates with an urgent need for cash,

causing them to seek to liquidate in whole or in part their interests in various investment funds,

including several funds controlled by and/or affiliated with the Carlyle Entities, by selling them to

third parties.

46.     ~~48.~~ In or around August and September 2009, Reijtenbagh and his affiliates

sought the Carlyle Entities' assistance in transferring limited partnership interests held by Bundora

in CPV and CEP III, two funds affiliated with the Carlyle Entities, to several different third-party

purchasers.  Because Bundora's limited partnership interests in CPV and CEP III were subject to

certain transfer restrictions, Reijtenbagh and his affiliates needed the consent and assistance of the

funds and Carlyle to effectuate the transfers.

47.     ~~49.~~ To accomplish the transfers of Reijtenbagh's interests in CPV and CEP

III, three sets of transfer agreements (the "Transfer Agreements") were executed by (1) Bundora

---

[1]    These are only some of Reijtenbagh's publicly reported fraudulent schemes.  He also was
convicted in the 1980s of defrauding KLM airlines by purchasing infant tickets for
round-the-world travel and then fraudulently converting them to adult tickets for use by him
and his adult family members.  *See* Lucette ter Borg, *A Dangerous Man: The Rise And Fall Of
Louis Reijtenbagh*, NRC HANDELSBLAD, May 5, 2009 ~~(attached hereto as Exhibit 7)~~.  This
scheme earned Reijtenbagh, who is a physician, the nickname "Baby Doc."  Additionally,
Reijtenbagh was sued by shareholders of European oil company Petroplus after he allegedly
embezzled €42 million in funds earmarked for distribution as dividend payments.
Reijtenbagh reportedly agreed to pay €25 million to settle the Petroplus matter.  *Id.*; Vanda
Carson, *Man Who Funded Case Against Bond's Banks In Art Scandal*, SYDNEY MORNING
HERALD, May 19, 2009 ~~(attached hereto as Exhibit 8)~~.

and its affiliates, including Plaza and Reijtenbagh; (2) the third-party purchasers; and (3) affiliates

of the Carlyle Entities.  Reijtenbagh caused Bundora to execute seven separate Transfer

48.   ~~50.~~ Bundora, Reijtenbagh, and their affiliates were represented by U.S.

counsel in connection with the negotiation and execution of each Transfer Agreement.  Each

Transfer Agreement constitutes a valid and binding contract.

49.   ~~51.~~ In addition to setting forth the various terms and conditions of the

transfers, each Transfer Agreement also included a release-of-claims provision (collectively, the

"Releases").  One of the Releases, for example, provided as follows:

> In consideration of the promises and other consideration set out herein: (a) [Bundora] and [the third-party purchaser] on the one hand; and (b) [the fund and various Carlyle-affiliated entities] on the other hand (including in each case, each of their respective predecessors in interest, successors in interest, present and former Affiliates and any agents, representatives, officers, directors, employees, executives, parents, shareholders, partners, members, principals, subsidiaries and controlled companies, heirs, executors, administrators, successors, assigns, sister or related companies and partnerships of the foregoing (collectively, the "Related Parties")) hereby **fully release and discharge the other and, in each case, the other's Related Parties, from any and all obligations, claims, demands, damages, liabilities,** debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents and executions whatsoever, **of whatever kind or nature, actions, causes of action or suits at law or in equity of whatever kind, state or federal, known or unknown, suspected or unsuspected,** whether brought in any federal or state court, or in any court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, which any of the releasing parties ever had or now has, or may have in the future, **upon or by reason of any matter, cause or thing occurring on or prior to the date hereof,** except as otherwise expressly provided in this Agreement.

~~See, e.g., Ex. 10 (CPV Transfer Agreement—Begonia) at ¶ 10 (emphasis~~ (Emphasis added).  Each

Release is substantively identical and each is a valid and binding provision of the Transfer

Agreement in which it appears.

50.   ~~52.~~ For purposes of the Releases, each of the ~~Carlyle~~ Plaintiffs is a "Related Part[y]" of CPV and/or CEP III and the Carlyle-affiliated entities named in the relevant Transfer Agreements, and the Reijtenbagh Defendants are each "Related Parties" of Bundora. Accordingly, by agreeing to and executing the Transfer Agreements and Releases for valuable consideration, the Reijtenbagh Defendants released any and all claims they had or may have had against ~~the Carlyle~~ Plaintiffs based on any and all events occurring on or prior to August 18, 2009, the date the first Transfer Agreements were signed by Bundora.

51.   ~~53.~~ This intentionally broad release encompasses any and all claims the Reijtenbagh Defendants had or may have had against ~~the Carlyle~~ Plaintiffs at that time, including any and all claims the Reijtenbagh Defendants had against ~~the Carlyle~~ Plaintiffs arising out of or related in any way to Moonmouth's investment in CCC.  Any one of these intentionally broad Releases by itself was sufficient to release any and all CCC-related claims the Reijtenbagh Defendants had or may have had against ~~the Carlyle~~ Plaintiffs.   Taken together, these seven releases demonstrate a clear intent on the part of the Reijtenbagh Defendants and ~~the Carlyle~~ Plaintiffs to release and waive any and all such claims.

III.        Defendants ~~Have~~ Breached The Releases And ~~Intend~~ **Threatened** To Breach The Subscription Agreements' Exclusive Delaware Forum Selection Clause

52.   ~~54.~~ Notwithstanding the Releases, Reijtenbagh and/or his affiliates ~~have~~ retained a Dutch law firm, Lemstra van der Korst, and ~~have taken~~ **took** affirmative steps to pursue claims against Plaintiffs in the Netherlands in connection with Moonmouth's investment in CCC, in breach of both the Releases and the Moonmouth Subscription Agreement's exclusive Delaware forum selection clause.

53.    55. In June and/or July 2012, Plaintiffs and CCC's former independent directors, Robert B. Allardice III, Harvey J. Sarles, and John L. Loveridge (collectively, the "Independent Directors"), each received copies of two letters sent by Lemstra van der Korst. One letter was sent on behalf of the Reijtenbagh Defendants (the "Moonmouth Letter"), and the other was sent on behalf of Defendant SRCCC (the "SRCCC Letter").

**A.    The Moonmouth Letter**

54.    56. Each Plaintiff has received at least one copy of the Moonmouth Letter, and each Plaintiff's Moonmouth Letter was substantively identical. A true and correct copy of one example of the Moonmouth Letter is attached hereto as Exhibit 16.

55.    57. The Moonmouth Letter recounts recounted the circumstances of Moonmouth's $60 million investment in CCC and alleges alleged that Plaintiffs are responsible for CCC's failure in spring 2008.

56.    58. The Moonmouth Letter states stated that based on these allegations, "Moonmouth holds [Plaintiffs] liable" under several Dutch statutes "for all the damage that it sustained and any and all damage that it sustains in the future in connection with" its investment in CCC. See Ex. 16 (Moonmouth Letter) at 7. The letter further contends contended that a "serious, personal accusation and claim . . . can be made against" Plaintiffs under Dutch law. See id. Accordingly, the Moonmouth Letter purports purported to "interrupt[] the statute of limitations . . . within the meaning of Article 3:317 of the Dutch Civil Code" for any claims that the Reijtenbagh Defendants, "any and all persons and/or legal entities affiliated with [Louis] Reijtenbagh," or any other CCC investor may have based on the allegations made in either the Moonmouth Letter or the Liquidator Actions. See id. at 7-8. Action.

57.  ~~59.~~ The retention of Lemstra van der Korst and the Moonmouth Letter each ~~represent~~represented an affirmative step ~~that~~taken by the Reijtenbagh Defendants ~~have taken~~ in advancement of claims under Dutch law against Plaintiffs in the Netherlands.  The Moonmouth Letter ~~constitutes~~constituted a particularly significant step, as the Dutch statute of limitations is five years and arguably would have expired on or before July 11, 2012 but for the Moonmouth Letter.[2]  Moreover, the retention of Lemstra van der Korst and the Moonmouth Letter ~~demonstrate~~demonstrated that the Reijtenbagh Defendants ~~intend to continue their pursuit of such~~intended to pursue claims in the Netherlands ~~in the future~~.

58.  ~~60.~~ However, as alleged above in paragraphs 48~~45~~ through ~~53~~51, in 2009, the Reijtenbagh Defendants and their affiliates released any and all claims they had or may have had against ~~the Carlyle~~ Plaintiffs, including any and all claims related to or arising out of Moonmouth's investment in CCC, through the Releases.  Even if the Reijtenbagh Defendants and their affiliates had not released all claims against ~~the Carlyle~~ Plaintiffs in 2009 (which they have), the Moonmouth Subscription Agreement nonetheless ~~would require~~requires them to bring any and all claims against Plaintiffs related to or arising out of Moonmouth's investment in CCC only in the courts of the State of Delaware, not the Netherlands.

~~61.   The Moonmouth Letters thus demonstrate that the Reijtenbagh Defendants (1) have breached and will continue breaching the Releases and (2) intend to breach the Moonmouth Subscription Agreement's exclusive Delaware forum selection clause by bringing claims related to and arising out of Moonmouth's investment in CCC in the Netherlands.~~

---

[2]  Plaintiffs do not concede that the Letters were adequate to toll the statute of limitations ~~on all claims or in all respects.~~  In any event, as described below, Defendants withdrew the Moonmouth and SRCCC Letters upon receiving notice of Plaintiffs' Verified Complaint.

**B.** **The SRCCC Letter**

59. 62. Each Plaintiff has received at least one copy of the SRCCC Letter and

each Plaintiff's SRCCC Letter iswas substantively identical. A true and correct copy of one

example of the SRCCC letter is attached hereto as Exhibit 17.

60. 63. The SRCCC Letter advisesadvised that "SRCCC's purpose – in

accordance with its Articles of Association – is representing the interests of all parties (both natural

persons and legal entities) that hold and/or held shares in [CCC] and sustained and/or might sustain

damage(s) in the future in connection with the acts" of Plaintiffs. *See Ex. 17 (SRCCC Letter) at*

4.

61. 64. The SRCCC Letter also allegesalleged that Plaintiffs are responsible

for CCC's failure in spring 2008. In support of this claim, the SRCCC Letter repeatsrepeated

substantially the same factual allegations made in the Moonmouth Letter, as alleged above in

paragraphs 57 and 58.

62. 65. The SRCCC Letter statesstated that based on these allegations,

"SRCCC holds [Plaintiffs] liable" under several Dutch statutes "for all the damage that the

investors sustained and any and all damage that they will sustain in the future in connection with"

their investment in CCC. *See Ex. 17 (SRCCC Letter) at 7.* The letter further contendscontended

that a "serious, personal accusation and claim . . . can be made against" Plaintiffs under Dutch law.

*See id.* Accordingly, the SRCCC Letter purportspurported to "interrupt[] the statute of limitations .

. . within the meaning of Article 3:317 of the Dutch Civil Code" for claims that SRCCC and

investors in CCC may have based on the allegations made in either the SRCCC Letter or the

Liquidator ActionsAction. *See id.*

63.   66.  Because SRCCC claims claimed to represent "the interests of all parties (both natural persons and legal entities) that hold and/or held shares in [CCC,]" SRCCC purports purported to represent the interests of all Private Placement Investors. See Ex. 17 (SRCCC Letter) at 4. In connection with their purchase of shares in CCC, however, each Private Placement Investor executed a Private Placement Subscription Agreement, which included an exclusive Delaware forum selection clause requiring them to bring all claims against Plaintiffs with respect to those purchases in the courts of the State of Delaware.

64.   67.  Because and to the extent that SRCCC purports purported to serve as the legal representative of all or some of the Private Placement Investors, and to stand in their shoes, bringing claims on their behalf, SRCCC is bound by the Private Placement Subscription Agreements that these Investors executed, including their exclusive Delaware forum selection clause. Accordingly, the Private Placement Subscription Agreements require SRCCC to bring any and all claims on behalf of Private Placement Investors in the courts of the State of Delaware, and nowhere else.

65.   68.  However, the formation of SRCCC and the SRCCC Letter demonstrate that SRCCC has attempted to preserve and thus intends to bring Dutch law claims in the Netherlands against Plaintiffs on behalf of all CCC investors, including Private Placement Investors, arising out of their purchases of shares in CCC. Indeed, SRCCC's Articles of Association state that SRCCC intends intended to conduct an investigation into possible claims against the Carlyle Entities for the purpose of bringing suit against them and authorizes authorized SRCCC, *inter alia*, to hire counsel, solicit potential plaintiffs, conduct negotiations with possible defendants, file and litigate lawsuits, and settle claims on a collective basis. The formation of SRCCC and the SRCCC letter thus demonstrate that SRCCC, to the extent it represents Private

~~Placement Investors, intends to breach the Private Placement Subscription Agreement's exclusive~~

~~Delaware forum selection clause.~~

### C.      Plaintiffs' Verified Complaint and the Withdrawal of the Moonmouth and SRCCC Letters

66.      After receiving the Moonmouth and SRCCC Letters, Plaintiffs retained

Dutch counsel and considered how best to respond to Defendants' breaches and threatened

breaches of their contractual obligations.    On September 6, 2012, Plaintiffs, joined by the

Independent Directors, filed the Verified Complaint, which alleged that (1) the Reijtenbagh

Defendants had breached the Releases by preserving and advancing claims in the Netherlands; (2)

the Reijtenbagh Defendants intended to breach the exclusive Delaware forum selection clause

contained in the Moonmouth Subscription Agreement by bringing suit in the Netherlands; (3)

SRCCC intended to breach the exclusive Delaware forum selection clause contained in the Private

Placement Subscription Agreements by bringing suit in the Netherlands.    Plaintiffs' Verified

Complaint sought declaratory and injunctive relief, as well as monetary damages.

67.      The next day, Plaintiffs provided Defendants, through their Dutch counsel

at Lemstra van der Korst, with copies of the Verified Complaint and associated pleadings.  Less

than a week later, Lemstra van der Korst responded by disclaiming any intent by Defendants to

pursue proceedings against Plaintiffs and abruptly withdrew the Moonmouth and SRCCC Letters.

68.      Plaintiffs' counsel responded to Defendants' Dutch counsel on September

18, 2012, confirming that the withdrawn Moonmouth and SRCCC Letters no longer had any legal

effect in terms of tolling the statute of limitations.  Plaintiffs' counsel also explained that, in light

of Defendants' prior actions, Plaintiffs required assurances that there would be no further

violations of Defendants' contractual obligations.  Accordingly, Plaintiffs' counsel requested that

Defendants agree to a simple and straightforward stipulation and proposed order memorializing

the effect of their withdrawal of the Moonmouth and SRCCC Letters and providing Plaintiffs with certain elements of the relief sought in the Verified Complaint. Specifically, the proposed stipulation sought, *inter alia*, Defendants' agreement that: (a) the Moonmouth and SRCCC Letters no longer had any legal effect; (b) the statute of limitations had run on Defendants' claims; (c) Defendants and their representatives would take no action in any jurisdiction or venue other than the State of Delaware to pursue claims against Plaintiffs with respect to, in connection with, or related in any way to the purchase of shares in CCC.

69.     Defendants' counsel responded on September 21, 2012, agreeing that Defendants' withdrawal of the Moonmouth and SRCCC Letters meant that the Letters had no legal effect and confirming that the withdrawal of the Moonmouth and SRCCC Letters places the parties in the same position as they would have been had the Letters never been sent. Defendants' counsel also disclaimed any intent, now or in the future, to pursue litigation against Plaintiffs in the Netherlands. However, despite withdrawing the Moonmouth and SRCCC Letters, Defendants refused to enter into a stipulation and proposed order confirming that they would comply with the exclusive Delaware forum selection clause by agreeing to bring any claims with respect to the purchase of CCC shares only in Delaware and agreeing that they would not pursue claims in the Netherlands.

70.     Although the Dutch statute of limitations arguably has now expired and Defendants have said they will not sue Plaintiffs in the Netherlands, because Defendants have refused to memorialize their agreement to that effect in a formal order of the Court, Plaintiffs have only the informal assurances of Defendants' counsel that Defendants will not attempt to resurrect their Dutch claims and no assurances at all that Defendants will not seek (or are not now seeking)

to pursue their claims outside of Delaware in locations other than the Netherlands in breach of both the Releases and the forum selection clause in the Subscription Agreement.

71.     Moreover, the continued existence of SRCCC, the purpose of which is to pursue claims on behalf of CCC shareholders, and SRCCC's refusal to agree to the stipulation and proposed order offered by Plaintiffs memorializing that it will not breach its obligations, leaves open the possibility that SRCCC may breach the Private Placement Subscription Agreement's exclusive Delaware forum selection clause in the future, as it previously sought to do.

72.     69.—Because SRCCC purports to represent all CCC shareholders, including Moonmouth and Parbold, any attempt by the Reijtenbagh Defendants to participate as a member of SRCCC would represent a further effort to circumvent and evade their contractual obligations under the Releases by pursuing through a third party claims they have released and discharged. Such actions by the Reijtenbagh Defendants would constitute a further breach of the Releases.

IV.     **THE REIJTENBAGH DEFENDANTS HAVE BREACHED THE RELEASES BY FUNDING THE LIQUIDATOR ACTION.**

73.     Upon information and belief, the Moonmouth Letters do not represent the Reijtenbagh Defendants' first or only attempt to evade their clear contractual obligations under the Releases.  Unable or unwilling to pursue claims in his own name given his status as a fugitive from the Belgian tax authorities, and bound by the Releases, Reijtenbagh apparently decided to pursue his claims through a third-party surrogate in the form of CCC's Joint Liquidators.

74.     According to their own public statements, CCC's Joint Liquidators have arranged for and are receiving "tens of millions of dollars" in litigation funding to finance and support the Liquidator Action, including the ongoing Guernsey proceedings.

75.     Upon information and belief, the Reijtenbagh Defendants and/or their affiliates are providing, in whole or in part, the Joint Liquidators' litigation funding in exchange

for a share of any recovery obtained by the Joint Liquidators, a preference as a creditor or shareholder in the liquidation of CCC, and/or some other form of valuable consideration, including a potential recovery from the Liquidator Action as a shareholder of CCC.

76.     The Reijtenbagh Defendants' potential ability to recover through the Liquidator Action is demonstrated by the Liquidators' communications with other former CCC shareholders, in which the Liquidators' Guernsey counsel has encouraged such investors to drop lawsuits against CCC and instead to seek recovery through the Guernsey proceedings.

77.     Through his associates, Reijtenbagh has denied funding the Liquidator Action. Despite these general denials, Plaintiffs have reason to believe that Reijtenbagh's denials were false and that he and/or his affiliates are using the Liquidator Action as a vehicle to pursue claims that he has released.

78.     Plaintiffs' belief is based, in part, on the fact that the Joint Liquidators are represented—and the Guernsey Action is directed—by Australian lawyer Jason Karas and his law firm, Lipman Karas. Mr. Karas and his firm are, respectively, the same lawyer and law firm retained by Reijtenbagh and Plaza in spring 2008 to analyze potential claims against the Carlyle Entities arising out of Moonmouth's investment in CCC.

79.     In addition, according to the Liquidators' website, they have developed their claims against Plaintiffs with input and assistance from lawyers in Australia, the British Virgin Islands, and New York, all of which are venues associated with the Reijtenbagh Defendants.

80.     Moreover, there are substantial parallels between the Lipman Karas Memo prepared for Reijtenbagh and Plaza by Karas in April 2008 and the complaints drafted at the direction of Lipman Karas and filed by Guernsey counsel in the Liquidator Action in July 2010.

For example, both the Lipman Karas Memo and the complaint in the Liquidator Action allege, *inter alia,* that CIM was reckless, grossly negligent, and negligent and breached various fiduciary and other duties because it: (a) failed to maintain an adequate liquidity cushion for CCC; (b) imprudently proceeded with CCC's public offering in July 2007; and (c) failed to preserve investor capital by winding down CCC after August 2007 and returning funds to investors.   Upon information and belief, the Lipman Karas Memo, prepared for Reijtenbagh and Plaza, served as a roadmap for the present Liquidator Action, outlining many of the facts, legal theories, and claims subsequently raised in the Liquidator Action.

81.    Plaintiffs' belief is further based, in part, on the fact that Reijtenbagh, who has been identified in the press as a well-known "litigation financier," has a lengthy track record of funding insolvency-related litigation in Australia, where the Joint Liquidators' counsel, Lipman Karas, is based.  Upon information and belief, Reijtenbagh has provided:

(a)    substantial litigation funding for another insolvency-related lawsuit in which Lipman Karas served as lead counsel for the liquidator, a $244 million action brought by the liquidator of failed Australian telecommunications company One.Tel against the firm's former directors, *see* Andrew Main, *Rich Calls Off Case Against Packer, Murdoch,* THE AUSTRALIAN, September 15, 2010; Katherine Jimenez, *Dutch Millionaire Behind One.Tel Legal Action,* THE AUSTRALIAN, August 27, 2010;[3]

---

[3]    The Trustee in the One.Tel matter, who is represented by Lipman Karas, recently was removed by an Australian court for a lack of objectivity toward creditors, failure to expend the estate's resources properly, and pursuit of "inappropriate investigations" and claims.  Leo Shanahan, *One.Tel Liquidator Sacked By NSW Supreme Court,* THE AUSTRALIAN, June 20, 2012.

(b)     in excess of $10 million in funding over a five-year period in support of a $1.5 billion lawsuit by the liquidator of the failed Australian firm Bell Group against the company's former bankers, *see* Vanda Carson, *Man Who Funded Case Against Bond's Banks In Art Scandal*, SYDNEY MORNING HERALD, May 19, 2009;

(c)     substantial litigation funding for a $50 billion lawsuit brought by Australian company Idoport Pty. Ltd. and Australian businessman John Maconochie against National Australia Bank Ltd., *see id.*; and

(d)     substantial litigation funding for a $100 million lawsuit pursued by the liquidator of the failed Australian firm Moage Ltd., *see* Elisabeth Sexton, *Weston States Silent On Who Is Funding Damages Claim*, SYDNEY MORNING HERALD, August 27, 2010.

82.     Plaintiffs' belief that the Reijtenbagh Defendants and/or their affiliates are funding the Liquidator Action recently was reinforced by Defendants' response to Plaintiffs' Verified Complaint.  As alleged above, after receiving notice of Plaintiffs' Verified Complaint on September 7, 2012, Defendants' counsel withdrew the Moonmouth and SRCCC Letters one week later, denying any intent to pursue proceedings in the Netherlands, and refused to accept service.

83.     Defendants' abrupt withdrawal of the Moonmouth and SRCCC Letters was surprising in light of the considerable steps Defendants already had taken in pursuit of their claims. In addition to engaging Dutch counsel, investigating the facts and circumstances surrounding CCC, and drafting the detailed Moonmouth and SRCCC Letters, Defendants also created a special-purpose vehicle, SRCCC, for the purpose of litigating claims related to CCC. Defendants' willingness to abandon their claims in the Netherlands so quickly, which would avoid any

discovery into the extent of other possible breaches, combined with their established track record of funding litigation and the involvement of their Australian counsel, strongly suggests that Defendants are simultaneously pursuing similar relief by funding the Guernsey Liquidator Action. By funding and supporting the Liquidator Action in exchange for valuable consideration, Reijtenbagh individually and/or certain of the other Reijtenbagh Defendants have breached and are continuing to breach the Releases.

84.     The Releases each extinguished any and all claims the Reijtenbagh Defendants had or may have had against Plaintiffs, including all claims related in any way to CCC. Yet, upon information and belief, the Reijtenbagh Defendants now are pursuing their released claims using the Liquidator Action as an intermediary. The Reijtenbagh Defendants should not be permitted to evade their contractual obligations under the Releases by hiring third parties to pursue claims on their behalf and/or for their benefit, after having waived those claims.

85.     As a result of the Reijtenbagh Defendants' breach of the Releases, Plaintiffs have incurred millions of dollars in damages in the form of costs, attorneys' fees, and expenses associated with defending against the Liquidator Action that would not have been suffered in the absence of the Reijtenbagh Defendants' breaches. Plaintiffs also have incurred and will in the future incur non-compensable losses in the form of the burdens associated with litigating claims that have been released and will incur additional irreparable injuries because they are being forced to litigate in a non-contractual forum. Accordingly, Plaintiffs are entitled to monetary damages as well as declaratory and injunctive relief.

**CLAIMS FOR RELIEF**
**COUNT I**
**BREACH OF RELEASES**
~~By The Carlyle Plaintiffs~~ Against The Reijtenbagh Defendants

86. ~~70.~~ Plaintiffs repeat and reallege the allegations in the preceding paragraphs of this First Amended Verified Complaint as if fully set forth herein.

87. ~~71.~~ Each of the Transfer Agreements is a valid and binding contract.  The Releases included in the Transfer Agreements are valid and binding contractual provisions.  Any and all conditions precedent to the enforcement of the Transfer Agreements and the Releases contained therein have been performed and/or satisfied.

88. ~~72.~~ In the Releases, the Reijtenbagh Defendants fully released and discharged ~~the Carlyle~~ Plaintiffs from any and all claims that any of the Reijtenbagh Defendants had or may have had against them as of the dates the Releases were executed.  By doing so, the Reijtenbagh Defendants fully released any and all claims they had or may have had against ~~the Carlyle~~ Plaintiffs arising out of or relating in any way to Moonmouth's investment in CCC.

89. ~~73.~~ The Reijtenbagh Defendants have violated the Releases by taking a number of steps to advance claims, either directly or indirectly, against ~~the Carlyle~~ Plaintiffs, including among other things sending the Moonmouth Letter, creating SRCCC, and directing the transmission of the SRCCC Letter. The Moonmouth ~~Letter purports to interrupt the Dutch statute(s) of limitations on claims arising out of and relating to Moonmouth's investment in CCC, which were fully released and discharged as to the Carlyle Plaintiffs in the Releases. Had the Reijtenbagh Defendants not sent the Moonmouth Letter to Plaintiffs, the Dutch statute of limitations on such claims arguably expired on or about July 11, 2012. The Moonmouth Letter~~and SRCCC Letters, the formation of SRCCC, and the retention of Lemstra van der Korst, among other things, constitute affirmative steps in the advancement of such claims and are therefore breaches of the Releases. ~~The Moonmouth Letter, the formation of SRCCC, and the retention of Lemstra van der Korst further demonstrate that the Reijtenbagh Defendants intend to persist in their~~

~~breach by continuing to pursue Dutch law claims against, *inter alia*, the Carlyle Plaintiffs in the Netherlands arising out of and relating to Moonmouth's investment in CCC.~~

90. ~~74.~~ As a result of the Reijtenbagh Defendants' breach of the Releases, ~~the Carlyle~~ Plaintiffs have suffered damages in the form of costs and attorneys' fees associated with retaining Dutch counsel that would not have been incurred in the absence of the Reijtenbagh Defendants' breaches. ~~Moreover, if the Reijtenbagh Defendants are permitted to continue breaching the Releases by pursuing claims against the Carlyle Plaintiffs that have been fully released and discharged, the Carlyle Plaintiffs will suffer substantial and irreparable harm.~~

91. Despite the withdrawal of the Moonmouth Letter, Plaintiffs have no assurances that the Reijtenbagh Defendants will not in the future again breach the Releases. If the Reijtenbagh Defendants are not enjoined from breaching the Releases and are able to pursue claims against Plaintiffs that have been fully released and discharged, Plaintiffs will continue to suffer substantial and irreparable harm.

92. Additionally, upon information and belief, the Reijtenbagh Defendants and/or their affiliates are funding (in whole or in part) the Liquidator Action in exchange for valuable consideration. The Reijtenbagh Defendants' funding of (and thus, participation in) the Liquidator Action constitutes a further breach of the Releases. Moreover, if the Joint Liquidators prevail in the Liquidator Action, certain of the Reijtenbagh Defendants may stand to recover as shareholders of CCC based on claims that they fully released and discharged through the Releases. Accordingly, the Reijtenbagh Defendants have breached the Releases by funding the Liquidator Action.

93. Plaintiffs have incurred substantial monetary damages as a result of the Reijtenbagh Plaintiffs' funding of the Liquidator Action that they would not otherwise have

incurred.  Additionally, the Reijtenbagh Defendants' funding of the Liquidator Action is causing

Plaintiffs irreparable harm.  The Carlyle Plaintiffs therefore are entitled to monetary damages to

compensate them for the Reijtenbagh Defendants' breach of the Releases as well as any other form

of relief appropriate and available under Delaware lawform of relief, including declaratory and

injunctive relief.

**COUNT II**
**DECLARATORY AND INJUNCTIVE RELIEF FOR BREACH OF THE FORUM**
**SELECTION CLAUSE**
By All Plaintiffs Against The Reijtenbagh Defendants

94.    76. Plaintiffs repeat and reallege the allegations in the preceding

paragraphs of this First Amended Verified Complaint as if fully set forth herein.

95.    77. The Moonmouth Subscription Agreement, including its forum

selection clause, is a valid and binding contract.   Any and all conditions precedent to the

enforcement of the Moonmouth Subscription Agreement and its forum selection clause have been

performed or satisfied.  The forum selection clause in the Moonmouth Subscription Agreement is

reasonable and enforcement thereof would be just and consistent with equitable principles.

96.    78. The Moonmouth Subscription Agreement's forum selection clause

requires the Reijtenbagh Defendants to bring any action, suit, or proceeding with respect to the

Moonmouth Subscription Agreement in Delaware.   However, the Moonmouth Letter

demonstrates that the Reijtenbagh Defendants are preparing to bring Dutch law claims with

respect to the Moonmouth Subscription Agreement against Plaintiffs in an action in the

Netherlands. were preparing to breach the clause by bringing claims outside Delaware. Despite

withdrawing the Moonmouth Letter, the Reijtenbagh Defendants have refused to agree that any

such actions, suits, or proceedings will be brought only in Delaware, leaving Plaintiffs with only

the Reijtenbagh Defendants' informal assurances that they will not breach the forum selection

<u>clauses in the future.</u> An actual controversy between Plaintiffs and the Reijtenbagh Defendants therefore exists with respect to the rights of the parties to the Moonmouth Subscription Agreement and their affiliates.

<u>97.</u>   ~~79.~~ If the Reijtenbagh Defendants breach the Moonmouth Subscription Agreement's forum selection clause by bringing the claims outlined in the Moonmouth Letter in ~~a proceeding in the Netherlands~~<u>any non-Delaware forum</u>, Plaintiffs will suffer irreparable harm because they previously bargained for and agreed to litigate all claims with respect to the Moonmouth Subscription Agreement exclusively in Delaware.

<u>98.</u>   ~~80.~~ Additionally, Plaintiffs have incurred substantial expense as a result of ~~the Reijtenbagh Defendants'~~<u>Plaintiffs'</u> actions to date and will incur substantial monetary ~~losses as a result of~~<u>damages if</u> the Reijtenbagh Defendants~~' breach, including attorneys' fees and costs associated with obtaining advice on Dutch law, defending a lawsuit in a foreign country, and bringing these proceedings to enforce their contractual rights.~~ <u>breach the clause.</u> If the Reijtenbagh Defendants breach the Moonmouth Subscription Agreement's forum selection clause, Plaintiffs will be entitled to recover those damages.

<u>99.</u>   ~~81.~~ Declaratory and injunctive relief prohibiting the Reijtenbagh Defendants from breaching the Moonmouth Subscription Agreement's forum selection clause is therefore necessary and proper under the circumstances of this case and such relief will terminate the uncertainty or controversy between the parties giving rise to this claim.

## COUNT III
## DECLARATORY AND INJUNCTIVE RELIEF FOR BREACH OF THE FORUM SELECTION CLAUSES
### ~~By All Plaintiffs~~ Against Defendant SRCCC

<u>100.</u>   ~~82.~~ Plaintiffs repeat and reallege the allegations in the preceding paragraphs of this <u>First Amended Verified</u> Complaint as if fully set forth herein.

101.    83. The Private Placement Subscription Agreements, including their forum selection clauses, are each valid and binding contracts.  Any and all conditions precedent to the enforcement of the Private Placement Subscription Agreements and their forum selection clauses have been performed or satisfied.   The forum selection clauses in the Private Placement Subscription Agreements are reasonable and enforcement thereof would be just and consistent with equitable principles.

102.    84. The Private Placement Subscription Agreements' forum selection clauses require all Private Placement Investors to bring all claims with respect to the Private Placement Subscription Agreements in Delaware.  SRCCC purports to represent the legal rights and interests of all investors in CCC, including the Private Placement Investors.  To the extent SRCCC seeks to act on behalf of the Private Placement Investors, SRCCC is bound by the Private Placement Subscription Agreement, including its forum selection clause, to the same extent as the Private Placement Investors.

103.    85. The SRCCC Letter demonstrates that SRCCC is was preparing to bring Dutch law claims on behalf of Private Placement Investors against the Plaintiffs, which are with respect to the Private Placement Subscription Agreement, in a proceeding in the Netherlands. An actual Despite the withdrawal of the SRCCC Letter, SRCCC remains in existence and able to pursue litigation on behalf of CCC shareholders.  Moreover, Defendants have refused to agree to the entry of an order providing that that any action, suit, or proceeding by SRCCC on behalf of CCC shareholders will be brought only in Delaware, leaving Plaintiffs with only SRCCC's informal assurances that it will not breach the forum selection clauses in the future.  An actual controversy between Plaintiffs and SRCCC therefore exists with respect to the rights of Plaintiffs and SRCCC under the Private Placement Subscription Agreements.

104. ~~86.~~ If SRCCC breaches the Private Placement Subscription Agreements' forum selection clauses by bringing the claims outlined in the SRCCC Letter in ~~the Netherlands~~any non-Delaware forum, Plaintiffs will suffer irreparable harm because they previously bargained for and agreed to litigate all claims with respect to the Private Placement Subscription Agreements in Delaware.

105. ~~87.~~ Additionally, Plaintiffs have incurred substantial expense as a result of SRCCC's actions to date and will incur substantial monetary ~~losses and as a result of SRCCC's breach~~damages if SRCCC breaches the forum selection clause, including attorneys' fees and costs associated with ~~obtaining advice on Dutch law, defending a lawsuit in a foreign country, and~~ bringing these proceedings to enforce their contractual rights. If SRCCC breaches the Private Placement Subscription Agreements' forum selection clause, Plaintiffs will be entitled to recover those damages.

106. ~~88.~~ Declaratory and injunctive relief prohibiting SRCCC from breaching the Private Placement Subscription Agreements' forum selection clauses is necessary and proper under the circumstances of this case and such relief will terminate the uncertainty or controversy giving rise to this proceeding.

~~PRAYER FOR RELIEF~~

WHEREFORE, Plaintiffs respectfully request the following relief:

**DECLARATORY RELIEF:**

A. A declaration that each of the Releases is a valid, binding, and enforceable contractual agreement,

B. A declaration that the Reijtenbagh Defendants have released any and all claims they had or may have had against ~~the Carlyle~~ Plaintiffs arising out of or related in any way to the facts and circumstances set forth in the Moonmouth Letter, including any and all claims

arising out of, derivative of, or related in any way to Moonmouth's investment in CCC,

C.    A declaration that the Reijtenbagh Defendants have breached the Releases by taking steps in the Netherlands in advancement of claims against ~~the Carlyle~~ Plaintiffs that have been released,

D.    A declaration that the Reijtenbagh Defendants have breached the Releases by funding the Liquidator Action,

E.    ~~D.~~ A declaration that the Private Placement Subscription Agreements and the Moonmouth Subscription Agreement, including their forum selection clauses, are valid, binding, and enforceable contractual agreements,

F.    ~~E.~~ A declaration that ~~the facts, circumstances, and~~any claims ~~set forth in~~ the Reijtenbagh Defendants may have arising from or relating to Moonmouth ~~Letter~~'s investment in CCC are with respect to the Moonmouth Subscription Agreement and that the Reijtenbagh Defendants (or their transferees or successors in interest) therefore may bring those claims only in Delaware,

G.    ~~F.~~ A declaration that SRCCC is purporting to act on behalf of the Private Placement Investors and, therefore, is bound by the Private Placement Subscription Agreements, including their forum selection clause, to the same extent as the Private Placement Investors,

H.    ~~G.~~ A declaration that ~~the facts, circumstances, and~~any claims ~~set forth in the SRCCC Letter~~SRCCC may bring on behalf of Private Placement Investors arising out of or relating to their investment in CCC are with respect to the Private Placement Subscription Agreements and, therefore, SRCCC must pursue any such claims on behalf of Private Placement Investors solely in Delaware,

**INJUNCTIVE RELIEF:**

~~H.      Preliminary and permanent injunctive relief enjoining the Reijtenbagh Defendants, or any of their affiliates or agents, or those over whom they exercise control, whether directly or indirectly, from bringing any claims or pursuing any litigation, whether directly or indirectly, outside of Delaware that arises out of or relates in any way to the facts and circumstances set forth in the Moonmouth Letter, including claims arising out of, derivative of, or related in any way to Moonmouth's purchase of shares in CCC.~~

I.      Preliminary and permanent injunctive relief specifically enforcing the Releases and prohibiting the Reijtenbagh Defendants, <u>or</u> any of their affiliates ~~or agents, or any person or entity over whom they exercise control, whether directly or indirectly~~<u>, transferees, or successors in interest</u>, from bringing any claims or pursuing any litigation, or assisting the pursuit of any litigation or claims, whether directly or indirectly, arising out of, derivative of, or related in any way to Moonmouth's purchase of shares in CCC, against ~~the Carlyle~~ Plaintiffs<u>, including but not limited to the funding of the Liquidator Action</u>.

<u>J.      Preliminary and permanent injunctive relief specifically enforcing the forum selection clauses and enjoining the Reijtenbagh Defendants, or any of their affiliates, transferees, or successors in interest, from bringing any claims or pursuing any litigation, whether directly or indirectly, outside of Delaware that arises out of or relates in any way to Moonmouth's purchase of shares in CCC.</u>

<u>K.</u>      ~~J.~~ Preliminary and permanent injunctive relief enjoining SRCCC, or any of its affiliates or agents, or those over whom it exercises control, whether directly or indirectly,  from bringing any claims or pursuing any litigation outside of Delaware that arises out of or relates in any way to ~~the facts and circumstances set forth in the SRCCC Letter, including claims arising out of, derivative of, or related in any way to~~ Private Placement Investors['] purchases of shares in

CCC,

## MONETARY RELIEF:

L.    K.—Money damages in the form of costs, attorneys' fees, and expenses

incurred by ~~the Carlyle~~ Plaintiffs in connection with the Reijtenbagh Defendants' breaches of the

Releases,

M.    L.—Attorneys' fees and costs associated with bringing this action, and

N.    M.—Such other and further relief as the Court deems just and proper.


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Angela C. Whitesell*

R. Judson Scaggs, Jr. (#2676)
Kevin M. Coen (#4775)
Angela C. Whitesell (#5547)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
*Attorneys for Plaintiffs Carlyle Investment*
*Management, L.L.C., TC Group, L.L.C., TCG*
*Holdings, L.L.C., David M. Rubenstein, Daniel A.*
*D'Aniello, William E. Conway, Jr., James H.*
*Hance, John C. Stomber, Michael J. Zupon,*

OF COUNSEL:

Robert A. Van Kirk
R. Hackney Wiegmann
Sarah F. Teich
Brian C. Rabbitt
WILLIAMS & CONNOLLY  LLP
725 12th Street, N.W.
Washington, DC 20005
(202) 434-5000

POTTER, ANDERSON & CORROON LLP

/s/ Brian C. Ralston

OF COUNSEL:

Gary A. Orseck
Alison C. Barnes
William J. Trunk
ROBBINS, RUSSELL, ENGLERT,
UNTEREINER & SAUBER LLP
1801 K Street, N.W.
Suite 411L
Washington, DC 20006
(202) 775-4500

Brian C. Ralston (#3770)
Dawn M. Jones (#4270)
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899-0951
(302) 984-6000
Counsel for Plaintiffs Robert B. Allardice III,
Harvey J. Sarles, and John L. Loveridge

Dated:  September 6 October____, 2012